NOT RECOMMENDED FOR PUBLICATION

File Name: 06a0790n.06

Filed: October 24, 2006

No. 05-1315

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

LUTHER McCASKILL,

    Defendant-Appellant.

_____/

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BEFORE:    CLAY and GILMAN, Circuit Judges; and STAFFORD,[*] District Judge.

    **STAFFORD, District Judge.** The defendant, Luther McCaskill ("McCaskill"), appeals his conviction and sentence on charges of conspiracy, wire fraud, and possession of forged securities. We **AFFIRM**.

## I. BACKGROUND

    In 1997, Eric Hoberg ("Hoberg") sought private, unconventional financing to build a mill in North Dakota to grind organic grains into flour. He originally sought out the services of Richard Sclar ("Sclar"), in Florida, paying Sclar $2,500 to secure financing for a mill expected to cost about $3,500,000. When Sclar left the country having failed to procure the financing, Sclar's ex-wife,

_____

[*] The Honorable William H. Stafford, Jr., United States District Judge for the Northern District of Florida, sitting by designation.

Sheila Greenspan ("Greenspan"), offered to help Hoberg obtain an insurance binder that could be used by Hoberg to obtain funding from a local bank or finance company. Hoberg acceded to Greenspan's offer of assistance.

In her effort to help Hoberg, Greenspan first contacted Jay Elbel ("Elbel") in Southern California. Describing himself as the attorney for Nigella Insurance Company ("Nigella"), whose president was Dan Cimini ("Cimini"), Elbel informed Greenspan that Nigella could handle the bonding, or insurance guarantee, for Hoberg's project. Because Nigella was not a double– or triple– A rated insurer, however, Greenspan was told that a major insurance company would have to reinsure, or provide an insurance wrap, for Nigella's policy. The initial binder price for the bond and the insurance wrap was $35,000, or 1% of the targeted financing amount. The ultimate cost of the bond was to be 10% percent of the loan.

Nigella, in fact, was a sham company created by McCaskill, an insurance businessman. When McCaskill learned that Greenspan was interested in obtaining financing for a multi-million dollar project, he contacted Ardeana Vance ("Vance") of A-Vance Insurance Agency in Detroit, Michigan. Vance was purportedly a licensed insurance broker who could write the policy and secure the necessary wrap from a major insurer such as Kemper or Western Surety Insurance Company. Greenspan thereafter received correspondence on A-Vance Insurance Agency's letterhead, informing her about efforts to obtain the insurance wrap and instructing her to send Hoberg's $35,000 binder to MC&D Service Company. On September 8, 1998, Hoberg wired the money as instructed. Hoberg's deposit was never returned to him even though no bond was ever issued and no financing

was ever obtained. Instead, Hoberg's $35,000 was split between McCaskill ($10,000), Vance ($10,000), Cimini ($10,000) and Elbel ($5,000).

On March 20, 2002, McCaskill, Elbel, Vance, and Cimini were indicted in a 32-count indictment. The charges against Vance were dismissed before trial. Cimini entered into a plea agreement with the government, and Elbel was placed in a pretrial diversion program. Only McCaskill went to trial.

All but three counts of the indictment were dismissed by the government before trial. The surviving counts included: (1) Count One: conspiracy to execute a scheme to defraud, cause forged securities to be transported in interstate commerce, use interstate wire communications to execute the scheme to defraud, and engage in a monetary transaction in criminally derived property, all in violation of 18 U.S.C. § 371; (2) Count Twenty-Five: wire fraud, in violation of 18 U.S.C. § 1343; and (3) Count Thirty-Two: possessing a forged security in violation of 18 U.S.C. § 513.

Trial began on April 13, 2004, and ended on April 16, 2004, with the jury's return of guilty verdicts on all three counts. McCaskill represented himself at trial, although an attorney was appointed to assist McCaskill as needed. McCaskill was sentenced to 60-month consecutive terms of imprisonment on Counts One and Twenty-five and a 68-month term of imprisonment on Count Thirty-two, for a total custodial sentence of 188 months, a bottom-of-the-guidelines sentence.

## II. DISCUSSION

### A. Prosecutorial Misconduct

McCaskill represented himself during trial and elected not to testify on his own behalf. Before closing arguments began, in response to the prosecutor's concern that McCaskill might try

to argue facts that were not in evidence, the court explained to McCaskill (outside the presence of the jury) that his argument would have to be limited to the evidence adduced at trial. Despite the judge's instruction, McCaskill repeatedly made factual assertions during his closing argument about his own actions and intentions--factual assertions that were not supported by the evidence adduced at trial. In response to one of these instances, in apparent exasperation, the prosecutor said: "Maybe if Mr. McCaskill would like to be put under oath." McCaskill responded: "No, I'm trying to do a closing argument." McCaskill did not otherwise object to the prosecutor's comment but continued on with his argument. Thereafter, the court repeatedly cautioned McCaskill that he could not discuss facts that were not in evidence. In addition, the jury was excused at one point so that stand-by counsel could further explain the limitations placed on McCaskill's closing comments.

McCaskill contends that the prosecutor's comment--"Maybe if Mr. McCaskill would like to be put under oath"--was "manifestly intended" to reflect on McCaskill's failure to testify. McCaskill agrees that the court should review this contention for plain error because he made no objection to the comment at trial. "The plain error doctrine mandates reversal only in exceptional circumstances and only where the error is so plain that the trial judge and prosecutor were derelict in countenancing it." *United States v. Slone*, 833 F.2d 595, 598 (6th Cir. 1987) (citations and internal quotation marks omitted). To establish plain error, a defendant must show that: (a) an error occurred in the district court; (b) the error was clear or obvious; (c) the error impacted the defendant's substantial rights by affecting the outcome below; and (d) the error seriously affected the integrity, fairness, or public reputation of the proceedings. *United States v. Koeberlein*, 161 F.3d 946, 949 (6th Cir. 1998), *cert. denied*, 526 U.S. 1030 (1999).

4

A prosecutor's indirect comments on a defendant's failure to testify require reversal only if "the comments were *manifestly intended* by the prosecutor as a comment on the defendant's failure to testify or were of such a character that the jury would naturally and reasonably take them to be comments on the failure of the accused to testify." *Bagby v. Sowders*, 894 F.2d 792, 797 (6th Cir.) (emphasis added), *cert. denied*, 496 U.S. 929 (1990). A court will not find manifest intent if some other explanation for the prosecutor's remarks is equally plausible. *United States v. Robinson*, 651 F.2d 1188, 1197 (6th Cir.), *cert. denied*, 454 U.S. 875 (1981).

Here, it is abundantly clear that the prosecutor's isolated remark about McCaskill's being "put under oath" was made in response to McCaskill's repeated attempt to argue facts to the jury that were not introduced into evidence at trial. That remark was triggered by, and it reflected on, McCaskill's improper closing argument. It was not "manifestly intended" by the prosecutor to comment on McCaskill's failure to testify at trial; nor was the comment "of such a character that the jury would naturally and reasonably take [it] to be [a] comment[] on the failure of the accused to testify." *Bagby*, 894 F.2d at 797. McCaskill's claim of error in this regard is without merit.

## B. 404(b) Evidence

McCaskill contends that certain portions of the testimony elicited from Vance and Sal Marra ("Marra") were erroneously admitted and resulted in reversible error. Specifically, Marra testified that, between 1997 and 1999, he and McCaskill were engaged in the business of providing fraudulent, non-existent construction bonds, about twelve in all, some written in the name of Nigella. Marra said that he and McCaskill evenly split the proceeds from these bonds. McCaskill did not object to this particular testimony at trial. Marra also testified (1) that he engaged in fraudulent

schemes with Cimini involving T-bills, (2) that Cimini and Karl Haas ("Haas") (whose name appeared on documents relevant to McCaskill's case) were one and the same person, (3) that, on occasion, he, McCaskill and Cimini discussed their fraudulent schemes together. McCaskill did object to Marra's testimony regarding Haas and the schemes involving Cimini. The court overruled the objection, explaining that Marra's testimony was relevant to the conspiracy count with which McCaskill was charged and was not, in fact, 404(b) evidence of *other* crimes. Finally, on redirect examination, the prosecutor introduced, without objection, a check made out to Marra for $125,000. Marra explained that McCaskill gave him the check after he (Marra) said that he needed a loan. The check proved to be worthless, was signed in McCaskill's handwriting in the name of "Edward Jones," and falsely stated that it was for a "Freddie Mac closing."

Without objection from McCaskill, Vance testified on direct examination that McCaskill once asked her to deposit into her business account a check in the amount of $100,000, payable to her business, from the account of a company for which she had done no work. The check, which turned out to be a counterfeited stolen check, was admitted into evidence, again without objection from McCaskill. Vance admitted that, despite knowing that McCaskill was "scamming" people, she deposited the check, then made a check payable to McCaskill for $50,000 before the bank discovered that the check was no good. On cross-examination by McCaskill, Vance stated that McCaskill never asked her to do anything illegal. On redirect examination, Vance conceded that, by asking her to deposit a counterfeited stolen check, McCaskill had indeed asked her to do something illegal.

During closing arguments, the trial court gave a limiting instruction, specifically

addressing the testimony from Vance and Marra. As to Vance's testimony regarding the $100,000 check, the court instructed the jury that the testimony was offered for the limited purpose of rebutting Vance's testimony, on cross-examination by McCaskill, that McCaskill had never asked Vance to do anything illegal for him. In fact, the testimony regarding the $100,000 check was first introduced in the prosecutor's direct questioning of Vance. As to Marra's testimony about other fraudulent schemes, the court instructed the jury that the evidence was offered for the limited purpose of (1) demonstrating a relationship between Marra and McCaskill "as alleged as a part of the conspiracy;" and (2) demonstrating that McCaskill had guilty knowledge or intent as it related to the transactions involving Nigella. The court further instructed the jurors that the evidence from both Marra and Vance was not to be considered as evidence of McCaskill's propensity to commit criminal or bad acts or as a reflection on his character. It was, instead, to be considered only for the limited purposes described by the court and no others.

Before instructing the jury, the court again gave a limiting instruction as to Marra's testimony. The court said:

> Keep in mind . . . that [Marra's testimony] [wa]s not offered to demonstrate that Mr. McCaskill is a bad guy or that he had a propensity to commit criminal offenses; [it was] offered to establish that a relationship existed firstly and that, in relation to Nigella insurance papers, that there was guilty knowledge and only for those limited purposes.

We review the district court's admission or exclusion of evidence for an abuse of discretion. *United States v. Mack*, 258 F.3d 548, 553 (6th Cir. 2001). In the absence of a contemporaneous objection, we review only for plain error. *United States v. Levy*, 904 F.2d 1026, 1030 (6th Cir.

1990), *cert. denied*, 498 U.S. 1091 (1991) (explaining that, where a defendant fails to make a timely objection stating the specific grounds for that objection, our review is limited to plain error).

As to Vance's testimony, there was no contemporaneous objection; so we review only for plain error, a standard that McCaskill has fallen far short of demonstrating. Vance's testimony regarding McCaskill's having given her a $100,000 stolen counterfeited check was brief, and it concerned an event that occurred at or near the time of the events involving Hoberg. The court, as noted earlier, gave a limiting instruction to the jury, making clear that Vance's brief testimony regarding the $100,000 check was <u>not</u> to be considered as evidence of McCaskill's propensity to commit bad acts or as a reflection on his character. Because McCaskill has in no way shown that Vance's testimony affected his "substantial rights" or that the fairness, integrity, or public reputation of the judicial proceedings were "seriously affected" by admission of her testimony, the court finds no plain error in the admission of Vance's challenged testimony.

To the extent Marra testified that he and McCaskill were engaged in the business of providing fraudulent, non-existent construction bonds (some in the name of Nigella), McCaskill did not make a contemporaneous objection and he has not shown that admission of the testimony constituted plain error. The same can be said for Marra's testimony--on redirect--that McCaskill gave Marra what proved to be a worthless check, signed in McCaskill's handwriting in the name of "Edward Jones," falsely stating that it was for a "Freddie Mac closing."

McCaskill *did* object to Marra's testimony about Haas and the schemes involving Cimini. The district court overruled the objection, finding that Marra's testimony was relevant to the conspiracy count with which McCaskill was charged and was not, therefore, 404(b) evidence of

other crimes. The government likewise argues that the evidence about which McCaskill now complains was inextricably intertwined with the Hoberg fraud, taking it out of the province of 404(b). *See United States v. Torres*, 685 F.2d 921, 924 (5th Cir. 1982) (per curiam) (explaining that, when Rule 404(b) evidence is "inextricably intertwined" with evidence relevant to the crime charged, the admonitions limiting the admission of 404(b) evidence do not apply); *United States v. Hardy*, 228 F.3d 745, 748 (6th Cir. 2000) (explaining that background evidence is admissible when it "is a prelude to the charged offense, is directly probative of the charged offense, arises from the same events as the charged offense, forms an integral part of a witness's testimony, or completes the story of the charged offense"). In the alternative, the government contends that the evidence was probative of McCaskill's intent to defraud Hoberg. *See United States v. Johnson*, 27 F.3d 1186, 1192 (6th Cir. 1994) (explaining that, "where there is thrust upon the government, either by virtue of the defense raised by the defendant or by virtue of the elements of the crime charged, the affirmative duty to prove that the underlying prohibited act was done with a specific criminal intent, other acts evidence may be introduced under Rule 404(b)"), *cert. denied*, 513 U.S. 1115 (1995); *United States v. Benton*, 852 F.2d 1456, 1468 (6th Cir.) (explaining that "where evidence of prior bad acts is admitted for the purpose of showing intent, the prior acts need not duplicate exactly the instant charge, but need only be sufficiently analogous to support an inference of criminal intent"), *cert. denied*, 488 U.S. 993 (1988).

The government correctly argues that Marra's testimony regarding Haas (whose name appeared on fraudulent Nigella documents introduced as exhibits in the case) and Cimini (who was named as a co-conspirator with McCaskill in Count One of the indictment) was admitted for a proper

purpose--either as 404(b) evidence used to establish McCaskill's intent to commit the crimes charged or as non-404(b) evidence that was inextricably intertwined with, or provided background evidence of, the crimes charged. The district court did not abuse its discretion in admitting such evidence.

McCaskill also contends that the district court erred by failing to conduct Rule 403 balancing prior to admitting the challenged evidence. Because McCaskill never requested an on-the-record balancing under either Rule 403 or Rule 404(b), the district court's failure to articulate such findings does not require reversal. *United States v. Cheese*, 39 Fed. Appx. 257, 262 (6th Cir. 2002), *cert. denied*, 537 U.S. 1223 (2003); *United States v. Cowart*, 90 F.3d 154, 157 (6th Cir. 1996) (explaining that when a defendant fails to request an on-the-record balancing, "the court's failure to make an express finding on this issue" does not require reversal).

## C. Sentencing

McCaskill was sentenced to 60-month consecutive terms of imprisonment on Counts One and Twenty-five and a 68-month term on Count Thirty-two, for a total custodial sentence of 188 months, a bottom-of-the-guidelines sentence. The statutory maximum sentence for Count One was 60 months; for Count Twenty-Five, 60 months; and for Count Thirty-Two, 120 months. Importantly, McCaskill's sentence did not exceed the statutory maximum.

McCaskill's sentence was based, in large part, on a pre-sentence report ("PSR") prepared by the probation office before the *Blakely v. Washington* decision was issued on June 24, 2004.[**] In the PSR, it was noted that McCaskill "refused to participate in the presentence interview." Among other things, the PSR described as relevant conduct a pattern of criminal activity resembling the Hoberg

---

[**] *Blakely v. Washington*, 542 U.S. 296 (2004).

scheme, but involving shell companies other than Nigella and victims other than Hoberg, that dated back several years. As noted in the PSR, these "related" swindles netted a total of $5,466,758.98 in fraudulent proceeds. The probation officer added eighteen points to McCaskill's base offense level for the described relevant conduct. The officer also added four points for McCaskill's role in the offense (he was a leader and/or organizer) and four points because the victims numbered fifty or more, resulting in a total offense level of thirty-three. The probation officer added three criminal history points for each of two prior criminal convictions, one for mail fraud in 1996, and one for conspiracy, forged security, bank fraud and other related offenses in 2001. In addition, the officer added two criminal history points because the instant offense occurred while McCaskill was on supervised release, and one criminal history point because the instant offense was committed less than two years after McCaskill was released from prison. Criminal history points totaled nine, placing McCaskill in a Criminal History Category IV. Based on a total offense level of thirty-three and a criminal history Category IV, McCaskill's guideline imprisonment range was 188 to 235 months.

McCaskill filed objections to the PSR, arguing, among other things, that under *Blakely*, no enhancements other than those proved to the jury could be assessed. After several postponements, McCaskill appeared for sentencing on February 14, 2005. At that hearing, which occurred after the Supreme Court decided *United States v. Booker,* 543 U.S. 220 (2005)*,* the government presented the testimony of a certified fraud examiner from the Florida Office of Financial Regulation. The examiner described her investigation into a scheme perpetrated by McCaskill and others that resulted in losses of $3,726,758.98 to victims. The hearing was rescheduled to allow the parties time to file

11

supplemental memoranda regarding the impact of *Booker*. On March 4, 2005, at the resumed sentencing hearing, the government presented the testimony of an FBI agent who described additional frauds allegedly perpetrated by McCaskill and his co-conspirators, involving losses to victims of almost $9 million.

McCaskill responded to the government's evidence by denying that he was involved in the schemes described by the witnesses. He otherwise did not challenge the guideline computation set forth in the PSR. Imposing sentence, the district court stated on the record:

> With respect to the guidelines, as the Court has determined them, that range is 188 to 235 months. The sentencing factors that the Court ought to consider pursuant to the statute, I think call for a sentence on the same magnitude. We have a gentleman who is very, very bright, who is not understating his ability when he says he'd rather have himself speak for himself than anybody else because he believes he could do it better and I think I can just about accept [that] proposition no matter how highly trained an attorney might be. He has all the skills in the world and yet for his lifetime he has committed those skills to the pursuit of crime, victimizing a lot of people and depriving them of lot of their money, and he appears determined to pursue that life no matter how aggressively the justice system seeks to intervene to stop him, and the only appropriate sentence I'm afraid is a sentence which will hopefully incapacitate him from pursuing these violations for a substantial period. I think I do need to consider his age in making that determination, because of course among the sentencing factors is the length of confinement necessary to deter the Defendant himself from committing future offenses as well as general deterrent factors and a sentence that is proportionate to the violations committed. Here we have already described the enormous amount of money and large number of people who los[t] money as a consequence of his actions. . . . So, the Court, in weighing those factors, including the Defendant's age [61 years] and health find that a sentence at the low end of the range would be appropriate.

J.A. at 505-07. Noting that the government did not object to the probation officer's calculation of losses attributable to relevant conduct ($5,466,758.98), the court limited the amount of relevant-

conduct loss to the amount specified in the PSR and did not use the much higher figure offered by the government at the sentencing hearing.

On appeal, McCaskill raises a number of issues regarding his sentence.

## 1. **Failure to Furnish Documents**

McCaskill first complains that his sentence was based on documents introduced as exhibits at his sentencing hearing, exhibits that he alleges he was never furnished beforehand. McCaskill's complaint, however, is meritless. The PSR described in detail the relevant conduct that the government sought to prove at the sentencing hearing; yet McCaskill submitted no objections to the probation officer's estimate of the losses attributed to relevant conduct. Instead, McCaskill objected, in a cursory manner, to the addition of *any* enhancements based on relevant conduct, stating that "there is, in reality, no need for McCaskill to argue relevant conduct . . .[because] the U.S. Supreme Court put that to rest in *Blakely v. Washington*." J.A. at 534. At the sentencing hearing, moreover, McCaskill did not complain that he had not seen or been given copies of the documents when the government moved to admit the challenged documents to prove the relevant fraud loss. Furthermore, although the documents were present in the courtroom and available for McCaskill's inspection, he never asked the court for time to review the documents. He simply objected to the introduction of hearsay evidence, then proceeded with his cross-examination, never suggesting that the documents were a surprise. Under the circumstances, the district court cannot be faulted for admitting the challenged documents.

## 2. **Crawford Claim**

Relying on *Crawford v. Washington*, 541 U.S. 36 (2004) (holding that the Confrontation Clause prohibits the admission of out-of-court statements that are testimonial in nature unless the declarant is unavailable and the defendant had a prior opportunity to cross-examine the declarant concerning the statements), McCaskill argues that the trial court erred in considering the hearsay testimony presented at his sentencing hearings. This court, however, has explicitly rejected such an argument. *See United States v. Katzopoulos*, 437 F.3d 569, 576 (6th Cir. 2006) (explaining that "there is nothing specific in *Blakely*, *Booker* or *Crawford* that would cause this Court to reverse its long-settled rule of law that [the] Confrontation Clause permits the admission of testimonial hearsay evidence at sentencing proceedings"); *United States v. Stone*, 432 F.3d 651, 654 (6th Cir. 2005) (holding that "*Crawford* does not change our long-settled rule that the confrontation clause does not apply in sentencing proceedings"), *cert. denied*, ___ S. Ct. ___, 2006 WL 1591782 (Oct. 2, 2006); *United States v. Silverman*, 976 F.2d 1502, 1510 (6th Cir. 1992) (*en banc*) (holding that "confrontation rights do not apply in sentencing hearings as at a trial on the question of guilt or innocence"), *cert. denied*, 507 U.S. 990 (1993). Based on binding precedent, we find no error in the district court's admission of hearsay evidence.

**3.  Rule 32 Claim**

McCaskill contends that the district court violated Rule 32 of the Federal Rules of Criminal Procedure by failing to explain both how it calculated the relevant conduct loss and why it enhanced McCaskill's sentence by four levels for his role in the offense. Rule 32 provides in relevant part:

> (3) Court Determinations. At sentencing, the court:
>
> (A) may accept any undisputed portion of the presentence report as a finding of fact;

(B) must--for any disputed portion of the presence report or other controverted matter--rule on the dispute or determine that a ruling is unnecessary either because the matter will not affect sentencing, or because the court will not consider the matter in sentencing; and

(C) must append a copy of the court's determinations under this rule to any copy of the presence report made available to the Bureau of Prisons.

Fed. R. Crim. P. 32.

McCaskill filed no written objections to that portion of the PSR recommending a four-level enhancement for his leadership/organizer role in the offense. At sentencing, having heard no objection to the leadership enhancement, the district court stated:

> I will also note that the presence report also assigns points for Mr. McCaskill as a leader organizer of the fraud. I have heard ample testimony at the trial and in connection with the evidence assembled here to conclude that is a proper assignment of points as well, so I am adopting the factual findings and the application of the guideline range as it appears in the report.

J.A. at 492. After the judge made the above comments, McCaskill, for the first time, objected to the leadership enhancement by saying: "I take exception to the fact that if I would be a leader of something then believe me everyone involved would know who I am and no one would collect any money." J.A. at 495. He did not otherwise elaborate on his objection, and the district court did not thereafter revisit its conclusion that a four-level leadership enhancement was appropriate given the "ample" evidence presented at trial and at sentencing.

We find no Rule 32 violation in the district court's treatment of the leadership enhancement. McCaskill failed to submit an objection to the PSR in this regard, leading the district court--as

permitted by Rule 32(3)(A)--to adopt the relevant, undisputed portion of the PSR as a factual finding. The court further explained that the enhancement was supported by "ample" record evidence. Although McCaskill thereafter objected to the enhancement, his objection was so perfunctory that it required no further elaboration by the district court. *See United States v. Brown*, 314 F.3d 1216, 1221 (10th Cir. 2003) (explaining that unless "objections involve non-perfunctory specific allegations of factual inaccuracy, no controverted matter exists, and the district court's fact-finding obligation under Rule 32 . . . is not implicated") (internal quotation marks and citation omitted), *cert. denied*, 537 U.S. 1223 (2003); *see also United States v. Pitts*, No. 96-2263, 1998 WL 165154, at *2 (6th Cir. Apr. 3, 1998) (explaining that a defendant who fails to object to the district court's lack of a sufficient explanation for imposing the particular sentence waives the issue) (citing *United States v. Tillman*, 25 F.3d 1052, 1994 WL 198165 (6th Cir. May 18, 1994)).

McCaskill did file a written objection to those portions of the PSR that outlined his relevant conduct. McCaskill explained his objection by stating that "[a]t this juncture there is, in reality, no need for McCaskill to argue the relevant conduct, [because] as of June 24, 2004, the U.S. Supreme Court, put that to rest, in *Blakely v. Washington*." He provided no "specific allegations of factual inaccuracy." *Brown*, 314 F.3d at 1221. At sentencing, after the district court ruled that *Blakely/Booker* did not preclude enhancements based on judge-found facts, McCaskill again objected to the enhancement for relevant conduct, stating, in essence, that he had not received any money from anyone other than Hoberg. He also reiterated his argument that the Supreme Court had prohibited enhancements based on judge-found facts. Responding to McCaskill's objection, the district court stated: "I am satisfied given the evidence received that Mr. McCaskill was sufficiently

involved in each of the fraudulent operations . . . that he should be held accountable at least for the sum that is computed by [the probation officer]." J.A. at 491. Given the lack of specificity in McCaskill's objections, the district court's ruling was more than adequate to satisfy Rule 32(3)(B).

**4. Reasonableness Claim**

McCaskill claims that the sentence imposed by the district court was unreasonable. He supports his claim by stating: "There was a total lack of evidence to support his enhancement for relevant conduct, role in the offense and number of victims and thus his sentence was inherently unreasonable." Def.'s Br. at 77-78. Given the record evidence, including the district court's explanation for its choice of sentence, we find no merit to this claim.

**5. Booker/Blakely Claims**

In his remaining sentencing arguments, McCaskill challenges the trial court's enhancement of his guideline range by any factor that was not charged in the indictment and proved to the jury beyond a reasonable doubt--in essence, a *Blakely/Booker* argument. In *Blakely,* 542 U.S. at 305, the Supreme Court found that the State of Washington's sentencing system, which allowed the court to impose sentencing enhancements based solely on the sentencing judge's factual findings, violated the defendant's Sixth Amendment rights because the facts supporting the findings were neither admitted by the defendant nor found by a jury beyond a reasonable doubt. In *Booker*, applying the *Blakely* analysis to the Federal Sentencing Guidelines, the Supreme Court held that "[a]ny fact (other than a prior conviction) which is necessary to support a sentence exceeding the [statutory] maximum authorized by the facts established by the plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt." *Booker*, 543 U.S. at 244. Under *Booker*,

the federal sentencing guidelines are now advisory in all cases, including those that do not involve

a Sixth Amendment violation. In the Supreme Court's words:

> If the Guidelines . . . could be read as merely advisory provisions that recommended, rather than required, the selection of particular sentences in response to differing sets of facts, their use would not implicate the Sixth Amendment. . . . For when a trial judge exercises his discretion to select a specific sentence within a defined range, the defendant has no right to a jury determination of the facts that the judge deems relevant.

*Id.* at 233.

Although the sentencing guidelines are no longer mandatory, *Booker* makes clear that a

sentencing court must still "consult [the] Guidelines and take them into account when sentencing."

*Id.* at 224. After *Booker*, this court explained:

> *Booker* did not eliminate judicial fact-finding. Instead, the remedial majority gave district courts the option, after calculating the Guideline range, to sentence a defendant outside the resulting Guideline range. . . . District courts . . . must, therefore, calculate the Guideline range as they would have done prior to *Booker*, but then sentence defendants by taking into account all of the relevant factors of 18 U.S.C. § 3553, as well as the Guidelines range.

*Stone*, 432 F.3d at 654-55. Before *Booker*, district courts used the preponderance of the evidence

standard when sentencing defendants. After *Booker*, this court has held that the preponderance of

the evidence standard still applies. *United States v. Barton*, 455 F.3d 649, 658 (6th Cir. 2006)

(rejecting the defendant's argument that, after *Booker*, sentencing enhancements must be proved

beyond a reasonable doubt); *United States v. Yagar*, 404 F.3d 967, 972 (6th Cir. 2005) (noting that

"a finding under the Guidelines must be based on reliable information and a preponderance of the

evidence"); *see also United States v. Chau*, 426 F.3d 1318, 1324 (11th Cir. 2005) (holding that if a

district court applies the Guidelines as advisory, nothing in *Booker* prohibits the district court from

making, under a preponderance-of-the-evidence standard, additional factual findings that go beyond a defendant's admission); *Barton*, 455 F.3d at 657 (holding that retroactive application of "*Booker* does not violate *ex post facto*-type due process rights of defendants").

In this case, the trial court made clear that it considered the Sentencing Guidelines to be advisory, not mandatory. As it was permitted to do, the court found, by a preponderance of the evidence, certain facts (none of which was specifically challenged by McCaskill either before or during sentencing) that resulted in points added to McCaskill's total offense level. *See United States v. Stafford*, 258 F.3d 465, 476 (6th Cir. 2001) (finding that the defendant was deemed to have admitted facts contained in the PSR to which defendant failed to object). These judicially-found facts did not result in a sentence that was beyond the statutory maximum; they did not result in a sentence violative of McCaskill's Sixth Amendment rights; and they did not result in a violation of McCaskill's *ex post facto*-type due process rights.

## III. CONCLUSION

For the reasons set forth above, we **AFFIRM** McCaskill's conviction and sentence.