NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 13a0305n.06

No. 12-3162

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
*Mar 27, 2013*
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE |
| | ) | SOUTHERN DISTRICT OF |
| SEAN D. MURPHY, | ) | OHIO |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

BEFORE: COOK, WHITE, and DONALD, Circuit Judges.

**HELENE N. WHITE, Circuit Judge.** Defendant-Appellant Sean D. Murphy ("Murphy") was convicted by a jury of one count of conspiracy to transport merchandise and money in interstate commerce, 18 U.S.C. § 371, one count of transporting merchandise and money in interstate commerce, 18 U.S.C. §§ 2314, 2, and two counts of traveling in interstate commerce with the intent to further promote an unlawful activity, 18 U.S.C. §§ 1952, 2. He was sentenced to four consecutive 60-month terms of imprisonment. Murphy appeals, asserting government misconduct, evidentiary error, and sentencing error. Because the government concedes that counts two and three of the indictment were insufficient, we DISMISS these counts, VACATE Murphy's sentence, and REMAND to the district court for resentencing. We AFFIRM with respect to Murphy's remaining claims.

**I.**

On January 18, 2009, police investigated a burglary and fire at a Brink's secure warehouse in Columbus, Ohio. Police found that the door to a Brink's vault had been cut through with a torch. The interior of the vault was on fire and the area was filled with smoke. Four holes were cut into the roof of the warehouse and there were footprints leading down the walls to the floor of the warehouse. An exterior door of the warehouse was sealed with epoxy and surveillance equipment was either destroyed or missing. The vault contained approximately $92,000,000 on the night of the heist, and around $396,290 was missing.

In March 2009, the FBI interviewed David Nassor pursuant to a proffer agreement with federal and local prosecutors. Nassor told the FBI that he, Murphy, Joe Morgan, and Robert Doucette burglarized a Brink's warehouse in Ohio. Police arrested Morgan in early April, and FBI Special Agent Jason Costello visited Doucette and told him that he was a suspect in the Ohio Brink's burglary. Doucette retained a lawyer and began cooperating with the FBI. He described the circumstances of the heist to the FBI and led them to a storage facility in New Hampshire where the tools for the heist and the remaining money were stored.

According to Doucette, Murphy approached him in the fall of 2008 with a proposal to rob a Brink's warehouse in Columbus, Ohio. Murphy also engaged Morgan and Nassor in the plan, although Nassor only assisted in preparation for the heist because of an injury he suffered earlier in the year.

Murphy directed Nassor to pick up a cell-phone jammer, a device that disrupts cellular communications in a given area, from Memphis, Tennesee. This device was necessary because Brink's had an alarm system that would communicate with its security provider by cellular signal in the event that the phone lines were cut. Cell-phone jammers are not sold in the United States, and importing them is prohibited. Murphy obtained a jammer through a British company called Global Gadget via FedEx. However, customs enforcement agents were intercepting jammers that passed through FedEx's Newark hub, necessitating shipment of the jammer to FedEx's Memphis hub in order to evade heightened security at Newark. Nassor traveled to Memphis and picked up the package at his hotel on December 3, 2008.

Murphy and Morgan also made a trip to Columbus in order to obtain DNA from individuals in the Columbus area "to keep the crime local." They brought cigarettes and drinks to a homeless shelter in the area. When the individuals consumed the cigarettes and beverages, Murphy and Morgan picked up the cigarette butts and empty drink containers and saved them for the night of the crime.

In early January 2009, Murphy rented a moving truck from Newmarket Storage in New Hampshire. Murphy, Morgan, and Doucette met at Murphy's Massachusetts warehouse and loaded the truck with various tools. Murphy and Morgan drove the truck to a storage facility in Pennsylvania, where they unloaded the tools in preparation for the heist.

On January 15, 2009, Murphy and Doucette rented a Dodge Journey in Revere, Massachusetts and picked up a 24-foot box truck in New Hampshire the following day. Murphy,

Doucette, and Morgan drove to Ohio and stayed in a hotel overnight. On January 17, they drove to the Pennsylvania storage facility to pick up the equipment they had dropped off. Before loading the equipment, they obscured the license plate and numbers on the truck and backed the truck into the facility so that individuals in the storage facility office would not be able to see what they were loading into the truck.

After loading the truck, Murphy, Doucette, and Morgan drove to Columbus and arrived at the Brink's warehouse at approximately 8:00 or 9:00 p.m. They parked the truck at the loading docks of another business and covered it with a tarp. They changed out of their regular clothes and into burglary gear selected by Murphy: white clothes underneath a one-piece black jumpsuit with galoshes over their normal shoes. These clothes were selected so that the crew could easily change their outward appearances by removing the galoshes and jumpsuits.

Murphy, Doucette, and Morgan approached the Brink's warehouse from the rear and cut through an exterior fence with wire cutters. Murphy and Morgan climbed to the roof using scaffolding and destroyed a security camera mounted on the side of the building. Doucette stayed behind at a nearby bridge to keep watch for the police. Murphy activated the cell-phone jammer, cut holes in the roof, and smashed the building's alarm system.

Murphy, Doucette, and Morgan entered the warehouse and moved trucks that were blocking the warehouse's garage door. Doucette sealed the exterior door with epoxy to keep out any unexpected Brink's workers and removed all of Brink's electronic equipment to insure that no recordings of the crime would be left.

Meanwhile, Murphy set up a thermal lance rod, a piece of equipment that burns at approximately 5,000 degrees and can melt through steel and concrete, and began cutting through the side of the vault. After several hours of cutting, Murphy gained access to the vault at approximately 6:30 a.m. Unfortunately for Murphy, the heat of the thermal rod ignited the contents of the vault, and large quantities of smoke quickly filled the room. Murphy, Doucette, and Morgan tried to put out the fire with fire extinguishers and water, but were unsuccessful. At this point, they took turns grabbing cash out of the vault.

Shortly before 9:00 a.m., Murphy, Doucette, and Morgan loaded the truck with their tools and prepared to leave. Murphy planted the cigarette butts and empty drink containers around the facility. The three drove to Pennsylvania where they unloaded the tools and coins into the storage facility. They placed the bills in garbage bags and traveled to Doucette's home in Massachusetts to count and divide the money. However, much of the money was burnt, wet, and smelled strongly of smoke. The next day, Murphy, Morgan, and Doucette washed the salvageable money in Doucette's washing machine and dryer to remove the smell of smoke. Any money that was burnt too badly to be saved was destroyed in Doucette's fireplace. They continued counting the money over the next few days.

Murphy began cooperating with the police near the end of 2009. He participated in four proffer sessions with the FBI, and provided details regarding his involvement in the Brink's heist during the third. Murphy's final proffer session was at the beginning of June 2010. The following month, the Essex County Jail, where Murphy was housed, conducted a contraband search and found

a book entitled "Master Thief: How to Be a Professional Burglar" by Sean Murphy in the possession of an inmate. In his book, Murphy described methods for committing burglary that largely mirrored the Brink's heist. For example, Murphy advised his readers to use a cell-phone jammer, to wear black jumpsuits over light clothes to avoid detection, to use storage facilities far from the target of the heist, and to use a thermal rod to cut through vault doors. Further, Murphy advised readers to "[b]e extremely careful when piercing the last layer of steel on the vault door. If your thermal [rod] catches something on fire in the vault, everything could burn up; and the smoke could prevent you from even entering the vault." Prison officials gave the book to the FBI.

## II.

A grand jury for the Southern District of Ohio indicted Murphy for conspiracy to transport merchandise and money in interstate commerce, 18 U.S.C. § 371, traveling in interstate commerce with the intent to further promote an unlawful activity, 18 U.S.C. §§ 1952, 2, and transporting merchandise and money in interstate commerce, 18 U.S.C. §§ 2314, 2. The case proceeded to trial and Murphy decided to represent himself with his court-appointed attorney serving as stand-by counsel. The court warned Murphy of the risks of self-representation and encouraged Murphy to reconsider, but he refused. Murphy's co-conspirators, Nassor and Doucette, testified against him pursuant to plea agreements with the government. After a five-day trial, the jury found Murphy guilty on all counts. After reviewing Murphy's offense conduct, personal history, and hearing testimony from FBI Agent Jason Costello regarding Murphy's cooperation with the government, the court sentenced Murphy to four consecutive terms of 60 months' imprisonment.

**III.**

On appeal, Murphy argues that the district court erred by denying his motion to dismiss counts two and three of the indictment, that the prosecutor's alleged misconduct should result in a mistrial, that the government did not disclose exculpatory evidence, that the district court erred by admitting Murphy's book into evidence, and that the district court erred in its finding of intended loss and sophisticated means at sentencing.

**A. Governmental Misconduct**

**1. Insufficiency of the Indictment**

Murphy challenges the district court's refusal to dismiss counts two and three of the indictment for failing to state an offense. Although the government opposed Murphy's motion before the district court, it now concedes the issue.

At sentencing, the court noted that the PSR recommended a sentence of 300 months' imprisonment. However, after considering Murphy's 18 U.S.C. § 3553(a) arguments, and taking into account time that Murphy had served in state custody since his indictment, the court decided to reduce the recommended sentence of 300 months to a total of 240 months. The court split this period of imprisonment into four 60-month terms of imprisonment on each of the four counts of conviction, to be served consecutively to one another for a total 240-month term of imprisonment, thereby suggesting that the court viewed the sentences as interdependent with one another. *See United States v. Faulkenberry*, 614 F.3d 573, 590–91 (6th Cir. 2010); *United States v. Clements*, 86

F.3d 599, 600–01 (6th Cir. 1996). Accordingly, we vacate Murphy's sentence and remand to the district court for resentencing on the two remaining counts.

## 2. Prosecutorial Misconduct

Murphy argues that the government violated his rights under the Fifth Amendment by referring to the fact that he did not testify during trial while objecting to Murphy's closing argument. Because Murphy did not object to the prosecutor's comments at trial, we review his claim for plain error. *United States v. Kuehne*, 547 F.3d 667, 687 (6th Cir. 2008).

This court must first determine whether the prosecutor's remarks were improper. *Id.* "If this Court finds that the prosecutor engaged in improprieties, this Court must then determine whether the improprieties were flagrant such that a reversal is warranted." *Id.* at 687–88. There are four factors to consider when determining whether a prosecutor's conduct was flagrant: "1) whether the conduct and remarks of the prosecutor tended to mislead the jury or prejudice the defendant; 2) whether the conduct or remarks were isolated or extensive; 3) whether the remarks were deliberately or accidentally made; and 4) whether the evidence against the defendant was strong." *Id.* at 688 (quoting *United States v. Modena*, 302 F.3d 626, 635 (6th Cir. 2002)) (internal quotation marks omitted).

On appeal, Murphy points to a single instance of prosecutorial misconduct. During his closing arguments, Murphy argued that he owned a security consulting company and that it was a legitimate business because a bank would not let him open a business account without a tax

identification number. However, these facts were not in evidence because Murphy elected not to testify. The following exchange occurred:

> **The Government:** Objection, Your Honor.
>
> **The Court:** Sustained.
>
> **The Government:** You are testifying. If you want to take the stand, you can testify all you want.

Murphy argues that these comments by the government warrant a new trial.

Prior to Murphy's closing arguments, the court warned him that he could not comment on facts that were not in evidence as part of his closing arguments. Murphy did not heed this warning and shortly into his argument, he began describing how he used to train individuals to use cell-phone jammers. The government objected and the court sustained the objection. Murphy resumed his argument and began to describe how he had to test the cell-phone jammer once it was obtained. The government objected and the court admonished Murphy that he was not allowed to testify via his closing argument and that he could only comment on evidence and explain what it meant. The court sustained three similar objections before the exchange that Murphy cites on appeal. After the government's comments, the court sustained three more objections, noting: "We have gone over this before." Following a sidebar, the court instructed the jury that Murphy had the right not to testify, and that comments made during a closing argument are not evidence.

This court confronted a similar issue in *United States v. McCaskill*, 202 F. App'x 70 (6th Cir. 2006) (unpublished). In *McCaskill*, the defendant chose to represent himself and elected not to testify at his trial. *Id.* at 73–74. When McCaskill repeatedly made factual assertions during his

closing argument, the prosecutor objected: "Maybe if Mr. McCaskill would like to be put under oath." *Id.* at 74 (internal quotation marks omitted). This court rejected McCaskill's claim of error and found that it was "abundantly clear that the prosecutor's isolated remark about McCaskill's being 'put under oath' was made in response to McCaskill's repeated attempt to argue facts to the jury that were not introduced into evidence at trial." *Id.*

Similarly, Murphy challenges a single instance of alleged prosecutorial misconduct during his closing arguments. Although the prosecutor should not have commented on Murphy's failure to testify, *see Byrd v. Collins*, 209 F.3d 486, 533 (6th Cir. 2000), this error was not flagrant and does not warrant reversal. Further, the judge gave a curative instruction cautioning the jury that Murphy had the right not to testify at his trial. Numerous witnesses testified against Murphy, including two of his co-conspirators, thereby providing the government with strong evidence of his guilt. We therefore reject Murphy's claim of prosecutorial misconduct.

### 3. Exculpatory Evidence

Murphy argues that the government violated *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to produce the following pieces of exculpatory evidence: (1) the recorded statement of Robert Doucette, (2) video taken from a neighboring business's security camera the night of the heist, (3) a picture of a smaller hole in the side of the Brink's vault, before the fire department enlarged the hole, and (4) information regarding DNA test results obtained from the cigarette butts and empty drink containers discovered at the scene of the heist.

"[T]he suppression . . . of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment." *Brady*, 373 U.S. at 87. *"Brady* also applies to the nondisclosure of evidence affecting the credibility of a witness whose 'reliability . . . may . . . be determinative of guilt or innocence.'" *United States v. Blood*, 435 F.3d 612, 627 (6th Cir. 2006) (quoting *Giglio v. United States*, 405 U.S. 150, 153–54 (1972)). Reversal is required only "where there is a reasonable probability that, had the evidence been disclosed, the result of the trial would have been different." *United States v. Bencs*, 28 F.3d 555, 560 (6th Cir. 1994). Because Murphy did not object to these issues below, we review his claims for plain error. *Blood*, 435 F.3d at 627–28.

Murphy argues that the government violated *Brady* by not turning over a video-taped statement of Doucette, the only witness who testified that Murphy was at the scene of the heist. Murphy does not explain why the video-taped statement of Doucette would have been exculpatory or changed the outcome of the trial. Murphy cross-examined Doucette extensively over two days on a wide range of topics, including his proffer with Agent Costello. Given the substantial evidence presented against Murphy, it is unlikely that production of Doucette's taped statement would have altered the outcome of the trial.

Murphy also argues that a video from a business neighboring the Brink's facility was not provided to him. Again, Murphy does not explain how this video would have been exculpatory or why it would have changed the outcome of the trial. Doucette testified that Murphy and his co-conspirators covered the truck with a large tarp prior to pulling up to the Brink's warehouse, with

only a small hole cut in the front of the cover for the driver to see the road. It is therefore unlikely that a security video from a nearby business would have revealed information exonerating Murphy.

Murphy contends that the government should have disclosed pictures of a smaller hole in the Brink's vault, rather than pictures of the vault with a larger hole in the side created after the fire department enlarged the hole to put out the fire. Murphy argues that a picture of the smaller hole would have allowed him to establish that the intended loss was less than the $92,000,000 that was in the vault at the time of the robbery. However, Murphy made this argument at his sentencing and the court acknowledged it, reducing the intended loss by half from $92,000,000 to $46,000,000. Thus, no error was committed.

Lastly, Murphy argues that information regarding another individual's DNA found at the scene of the crime was disclosed to him on the day of the trial, thereby prejudicing his case as he was unable to fully investigate the individual identified by the DNA. *"Brady* generally does not apply to delayed disclosure of exculpatory information, but only to a complete failure to disclose," and a "[d]elay only violates *Brady* when the delay itself causes prejudice." *Bencs*, 28 F.3d at 560–61 (citations and internal quotation marks omitted). The DNA discovered on one cigarette butt found at the crime scene matched the DNA of a homeless individual named Anthony L. Woods. This match was discovered a few weeks before Murphy's trial and was promptly disclosed to Murphy. Because the information regarding Woods was promptly disclosed to Murphy before his trial, no *Brady* violation occurred.

Murphy has not demonstrated that any of the information he seeks would have changed the outcome of his trial given the substantial evidence against him. For this reason, we deny Murphy's *Brady* claims.

## B. Evidentiary Error

Murphy challenges the admission into evidence of his book, "Master Thief: How to Be a Professional Burglar," arguing that it had a prejudicial effect on the jury and the court failed to balance the prejudicial nature of the book against its probative value. At trial, Murphy objected to the admission of the book, claiming that it was part of his proffer to the government. After hearing evidence from both parties, the court ruled that the book was not part of Murphy's proffer and would be admitted.

Because Murphy did not object to the admission of the book on the grounds he now raises on appeal, the plain-error standard applies. *United States v. Demjanjuk*, 367 F.3d 623, 629 (6th Cir. 2004). Under the plain-error standard, there must be "(1) error, (2) that is plain . . . (3) that affects substantial rights . . . [and that] (4) . . . seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* (quoting *Johnson v. United States*, 520 U.S. 461, 466–67 (1997)) (internal brackets omitted).

Murphy's book plainly has probative value. It recommends that readers follow substantially the same steps that Murphy took when committing the Brink's heist, including advice on how to obtain and use a cell-phone jammer and a warning that users should be careful not to ignite the contents of the vault when using a thermal lance. Murphy suggests that the book could have been

viewed by the jury as an admission that he committed similar burglaries in the past, and that the court should have warned the jury to avoid drawing inferences about Murphy's character and criminal past. However, Murphy did not request such an instruction at trial or notify the court that he was concerned that the book's prejudicial character might outweigh its probative value. We reject Murphy's claim.

## C. Sentencing Error

Murphy argues that the district court erred by reducing the intended loss of his offense from $92,000,000 to $46,000,000, and no further, because the court held his co-conspirators accountable for only $2,500,000. We review a district court's amount-of-loss finding for clear error. *United States v. Poulsen*, 655 F.3d 492, 512 (6th Cir. 2011). "Intended loss" is defined as: "pecuniary harm that was intended to result from the offense," which includes "pecuniary harm that would have been impossible or unlikely to occur." U.S.S.G. § 2B1.1 cmt. n.3(A)(ii). The district court heard undisputed evidence that the Brink's vault contained $92,000,000 at the time of the heist. However, given that the typical amount of money in the vault was approximately $50,000,000, the district court decided to reduce the intended-loss finding to $46,000,000. The court did not clearly err by finding that the intended loss was half the amount actually contained in the vault.

Murphy also argues that the district court abused its discretion by applying the "sophisticated means" enhancement to his sentence. *See* U.S.S.G. § 2B1.1 cmt. n.8. Murphy acknowledges that the sophisticated-means enhancement applies to him, but asserts that because Morgan and Doucette did not receive the enhancement, its application to him is not fair. Application of the sophisticated-

means enhancement presents a question of fact and is reviewed for clear error. *United States v. Middleton*, 246 F.3d 825, 847–48 (6th Cir. 2001). Murphy objected to the sophisticated-means enhancement on fairness grounds and the court overruled his objection, explaining that the offenses involved substantial planning and that Murphy was the "mastermind" behind the burglary. The district court did not clearly err by applying the enhancement to Murphy based on his role in the offense.

## IV.

For the foregoing reasons, we DISMISS counts two and three of the indictment, VACATE Murphy's sentence, and REMAND to the district court for resentencing. We AFFIRM with respect to Murphy's remaining claims.