RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 16a0271p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

Nos. 15-2041/16-1163

KEVIN PRICE,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:14-cr-00026—Robert J. Jonker, Chief District Judge.

Argued: July 27, 2016

Decided and Filed: November 14, 2016

Before: SILER, GIBBONS, and KETHLEDGE, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Jeffrey P. Nunnari, Toledo, Ohio, for Appellant. Sally J. Berens, UNITED STATES ATTORNEY'S OFFICE, Grand Rapids, Michigan, for Appellee. **ON BRIEF:** Jeffrey P. Nunnari, Toledo, Ohio, for Appellant. Mark V. Courtade, UNITED STATES ATTORNEY'S OFFICE, Grand Rapids, Michigan, for Appellee.

_____

## OPINION

_____

KETHLEDGE, Circuit Judge. Kevin Price argues that the police arrested him without probable cause and that the district court therefore should have suppressed the guns and drugs they seized three hours after his arrest. By the time of his arrest, however, the police had

1

information that Price was the supplier for another heroin dealer whom the police had arrested two weeks before; and immediately before Price's arrest, the police saw (or at least could reasonably believe they had seen) Price engage in an apparent hand-to-hand drug deal and then flee after realizing that the police were present. We reject Price's argument and affirm.

I.

At dusk on February 4, 2014, seven members of the Kent Area Narcotics Team set out to execute a search warrant at the home of Kevin Price, at 1116 Fuller Avenue SE in Grand Rapids. The weather was cold and in some places the neighborhood roads were reduced to a single lane from the snowbanks on each side. The officers suspected that Price was a heroin dealer: per the warrant affidavit of Detective Nick Schwein, multiple informants—including another dealer who had recently identified Price as his source of supply—had reported that Price was "dealing large quantities of heroin" from his home. The officers also had a description of Price's vehicles and knew that he was a six-time narcotics felon.

Given Price's criminal history, the team wanted to know his whereabouts before trying to enter his house. Their plan was to detain Price outside before searching inside. Price's house sat near the southeast corner of the intersection of Fuller Avenue, which runs north-south, and Fisk Road, which runs east-west. Schwein and two other officers sat in a police-surveillance van on Fuller, just south of Price's house; two more officers sat in an unmarked Crown Victoria on Fisk, just west of the house. Soon Price's truck, with a snowmobile trailer in tow, drove north on Fuller past the surveillance van. The truck passed Price's house and made a left onto Fisk, heading west toward the Crown Vic. Before reaching those officers, however, the truck and trailer came to a halt in the snowbound street, partially blocking it. One of the officers in the Crown Vic, Sheriff's deputy Patrick Frederick, then saw Price exit the truck and walk over to an idling Chevrolet Tahoe, whose driver lowered his window. Price spoke briefly with the driver and then leaned his head, hands, arms, and shoulders into the vehicle—a motion that Frederick had seen many times before, and that in his experience was indicative of a drug transaction. Then the conversation ended and the Tahoe drove off.

Frederick radioed the other officers to ask whether he should follow the Tahoe. They said he should stay put to watch Price, who began walking east on Fisk and then turned south, into an alley behind his house. There, Price was spotted by Detective Tiffany MacKellar, a late arrival who had parked in that same alley, but north of Fisk Street, looking south. She positively identified Price as he paced back and forth near a truck parked in the alley behind his house. Then Price got into that truck and drove north out of the alley, turning west onto Fisk and then north onto Fuller.

MacKellar called out over the radio that the officers should move quickly to seize Price. The snowbanks and Price's trailer briefly delayed Frederick in the Crown Vic, but he soon followed Price north on Fuller, with MacKellar looping around the block to intercept Price head-on. The officers stopped Price at the intersection of Fuller and Alexander Street, a block north of his house. There they ordered him out of his truck and onto the ground at gunpoint before placing him in handcuffs. Then they took Price back to his house and brought him inside while they searched the premises.

In the house, the police found drug-dealing paraphernalia—scales, presses, chemical cutting agents—but no illegal drugs. They also found documents showing that Price rented two units at a nearby storage facility. Schwein read Price his *Miranda* rights and asked for permission to search the storage units; Price told him to get a warrant. Schwein left to prepare a warrant application and Deputy Frederick went to the storage facility so that he could describe the premises for a warrant affidavit. There, he learned that Price's storage units consisted of a mailbox and a parking place occupied by a large van. Frederick called the officers at Price's house to tell them about the van; they in turn questioned Price about it. At that point, three hours after his arrest, Price admitted that the van was his and that he kept guns inside it. Price consented to a search of the van, in which Frederick then found an AK-47, three Taurus handguns, and 200 grams of cocaine.

A federal grand jury thereafter indicted Price on a single count of being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(e)(1). Before trial, Price moved to suppress the government's evidence on the grounds that his seizure and detention were unlawful, and that, but for his detention, he would not have consented to a search of his van. The

district court denied the motion after hearing testimony from Schwein, Frederick, MacKellar, and other officers present during the search of Price's home. A jury later convicted Price and the district court sentenced him to 324 months' imprisonment, which was the bottom of his Guidelines range.

Price thereafter moved pro se for the return of certain property seized by police during the search of his home. The district court denied the motion. These appeals followed.

II.

A.

Price argues that the police arrested him without probable cause when they took him into custody at gunpoint at the intersection of Fuller and Alexander Street, and that his consent to search his van, given three hours later, was therefore invalid. Thus he says the district court should have granted his motion to suppress. Our standard of review is deferential: although we review the district court's legal conclusions de novo, we review its factual findings for clear error and consider the evidence in the light most favorable to affirmance. *See United States v. Winters*, 782 F.3d 289, 294-95 (6th Cir. 2015).

To have probable cause for an arrest, the police must be aware of "facts and circumstances" sufficient to allow a prudent person to think the arrestee has committed or is about to commit a crime. *Radvansky v. City of Olmstead Falls*, 496 F.3d 609, 614 (6th Cir. 2007). When the police already have reasonable suspicion that a person has committed a crime, and the suspect later flees from the police, they have probable cause to arrest him. *See Weaver v. Shadoan*, 340 F.3d 398, 409-10 (6th Cir. 2003).

Here, the police arrived at Price's house with at least reasonable suspicion—that is, "a particularized and objective basis," *id.* at 407—to believe that Price was dealing drugs. As Detective Schwein attested in his search-warrant affidavit, the police had received information from multiple sources that Price was "dealing large quantities of heroin." That information included that, only two weeks before, the police had arrested another heroin dealer, Larry Vaughn, who identified Price as his supplier and said that Price dealt large quantities of heroin

out of his house.  In addition, after the police arrived, Deputy Frederick observed Price engage in conduct that, in Frederick's experience, was indicative of a hand-to-hand drug sale.  That Price himself was a six-time narcotics felon only reinforced that belief.  *See United States v. Stepp*, 680 F.3d 651, 667 (6th Cir. 2012).

Moreover, by the time Price walked down the alley behind his house, Price had walked or driven past three police vehicles:  the surveillance van on Fuller, the Crown Vic on Fisk, and MacKellar's vehicle in that same alley, facing him on the other side of Fisk.  True, the vehicles were unmarked; but unmarked does not mean unrecognizable, particularly since, as the district court correctly observed, a Crown Victoria is "easily associated with police even when unmarked."  Op. at 10.  And then Price engaged in conduct that, given the circumstances, the officers could regard as flight:  he abandoned his truck and trailer in the street, thereby partially blocking it; he paced around in the alley behind his house, as if figuring out what to do; and then he took off in a truck different from the one in which he had arrived.  By this point, if not earlier, the police had probable cause to think that Price was a heroin dealer.

At oral argument, Price's counsel responded, not unreasonably, that the police could not infer both that Price knew they were there (the premise of the inference about flight) and that he sold drugs to the Tahoe driver in plain view of those same officers.  But Price might not have realized until after his encounter with the Tahoe driver that the two police vehicles he had already seen, and McKellar's vehicle—which he saw after he walked away from the Tahoe— were in fact police vehicles.  It remains possible of course, that Price was not engaging in a drug deal when he put his upper body inside the driver's window of an idling vehicle on a snowy night in February, and that Price was merely going about his regular business when he left his truck and trailer partially blocking the street and then drove off in another vehicle.  But the police deal in probabilities, not certainties.  Here, viewing the record in the light most favorable to affirmance, the police could reasonably infer that Price's behavior was not merely a series of remarkable coincidences—and that instead he was likely dealing drugs.  Probable cause requires no more than that.

Price's arrest was lawful, and thus did not vitiate his later consent to search his van.  The district court therefore properly denied Price's suppression motion.

B.

Price also argues in a separate, pro se appeal that the district court erred when it denied his Rule 41(g) motion for the return of his property. We review the district court's decision for an abuse of discretion. *See Savoy v. United States*, 604 F.3d 929, 932 (6th Cir. 2010).

Rule 41 permits federal criminal defendants to move for the return of unlawfully seized property "in the district where the property was seized." Fed. R. Crim. P. 41(g). For the district court to grant the motion, however, the federal government must have itself possessed the property at some point. *See Okoro v. Callaghan*, 324 F.3d 488, 491-92 (7th Cir. 2003). Here, the district court concluded, based on undisputed testimony, that "state and local officers" had seized and disposed of the property—cars, jewelry, electronics, and cash—that Price sought to have returned. Hence the federal government never possessed the property at issue, and the district court was correct to deny the motion.

The district court's judgment is affirmed.