NOT RECOMMENDED FOR PUBLICATION
File Name: 17a0507n.06

Nos. 16-1168/16-1343

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Aug 30, 2017
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| SANYANI EDWARDS, | ) | DISTRICT OF MICHIGAN |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

BEFORE: BOGGS, BATCHELDER, and WHITE, Circuit Judges.

**ALICE M. BATCHELDER, Circuit Judge.** These consolidated appeals arise from Sanyani Edwards's conviction for conspiring to commit health-care fraud as one participant in a network of physicians, pharmacists, and others who engaged in a kickback scheme in the Detroit area. Edwards asserts that the district court erred: (1) by admitting certain testimony at trial from a federal agent who supervised the collection of wiretaps against him; (2) by allowing him to represent himself during sentencing; (3) by selecting as the loss amount for sentencing purposes the amount set forth in his Pre-Sentence Report (PSR); and (4) by using the same loss amount as the restitution award. Finding no error, we affirm the judgment of the district court.

**I.**

We have previously considered cases involving other members of this conspiracy and

described the scheme as follows:

> The leader of these conspiracies, Babubhai Patel, was a registered pharmacist and
> businessman who owned or controlled at least twenty pharmacies in Michigan.
>
> * * * *
>
> The conspiracies began in January 2006 and ended in August 2011 when Patel
> and his associates were arrested, effectively ending their illegal activities.  The
> number of pharmacies controlled by Patel varied over time, and he changed their
> corporate structures frequently.  Patel hired all of the staff and supervised the
> pharmacy operations.
>
> The scheme to defraud insurers depended on the participation of physicians,
> pharmacists, recruiters, and patients.  Patel paid cash bribes to physicians to entice
> them to write patient prescriptions for expensive medications and controlled
> substances that could be billed to Medicare, Medicaid, or private insurers through
> the Patel pharmacies.  He paid kickbacks to managers of health-related companies
> so that they would send patients to his pharmacies, and he employed "marketers"
> to recruit "patients" directly from the streets.
>
> Pharmacists facilitated the criminal activity by charging insurers for expensive
> medications that were ordered from wholesale distributors and held in inventory
> but not dispensed to patients. These surplus medications were later returned to the
> supplier for credit or sold on the black market.  Pharmacists also billed insurers
> for controlled substances that the pharmacists knew were illegally prescribed.
> These controlled medications included hydrocodone (Vicodin, Lortab),
> oxycodone (Oxycontin), alprazolam (Xanax), and codeine-infused cough syrup.
> When filling prescriptions, the pharmacists usually "shorted" the number of
> dosage units placed in the medication vials for patients, billed the insurers for the
> full drug quantities prescribed, and then sold the excess pills on the street.
>
> A significant portion of the prescription fraud was perpetrated through Visiting
> Doctors for America (VDA), a physician group that purported to provide home
> doctor visits to patients.  Marketers recruited "patients" from homeless shelters
> and soup kitchens by offering them small amounts of cash or controlled
> substances.  The marketers transported the "patients" to a VDA physician, who
> performed cursory examinations of the "patients" while they sat together in one
> room.  VDA staff provided the co-conspirators with dummy patient files and
> blank prescription pads previously signed by a physician or physician's assistant.
> Mehul Patel and later Arpit Patel, neither of whom is a physician, wrote
> prescriptions for controlled medications and expensive non-controlled

-2-

medications on these blank, pre-signed prescription pads. The prescriptions were taken to the Patel pharmacies, where the pharmacists used the dummy patient files to enter patient profiles into the computer database, billed for all of the medications prescribed, but filled only the controlled medications. The controlled substances were then distributed, or sold on the street.

Patel paid his pharmacists salaries, bonuses, and twenty percent of pharmacy profits to encourage them to engage in fraudulent practices.

*United States v. Patel*, 579 F. App'x 449, 451–52 (6th Cir. 2014).

The grand jury indicted Sanyani Edwards—along with more than twenty other defendants—for health-care-fraud conspiracy in violation of 18 U.S.C. § 1349, and conspiracy to distribute controlled substances in violation of 21 U.S.C. § 846. A superseding indictment added a charge for conspiracy to pay and receive health-care kickbacks in violation of 18 U.S.C. § 371. Edwards went to trial with two co-defendants, where a jury found him guilty of all three counts.

At trial, the government's evidence illuminated Edwards's role in the conspiracy. First, the evidence demonstrated that Edwards, who is a psychologist, managed the prescription-writing activities of a psychiatrist named Dr. Mark Greenbain, who wrote prescriptions to Patel's pharmacies. Greenbain was licensed by the United States Drug Enforcement Administration (DEA) to prescribe controlled substances, but Edwards was not. One of Patel's twenty-six pharmacies in Detroit, Care 4 U Pharmacy, was located across from the office of Dr. Pramod Raval, whose office space Greenbain occasionally used. Edwards worked with Greenbain at that office. The pharmacist at Care 4 U, Anish Bhavsar, testified that he had observed Edwards both at the pharmacy and at Greenbain's home, and that Edwards acted as Greenbain's "personal assistant." Bhavsar testified that on six occasions, he collected names of patients and went with Patel to Greenbain's house to obtain prescriptions for the listed names from Greenbain. On one of those visits, he saw Patel give money to Greenbain to encourage him to write prescriptions; twice, he saw Edwards there.

Another pharmacist, Ashwani Sharma, also testified about Greenbain, Edwards, and another assistant, Ms. Jackson, explaining that all three saw patients in the office of Dr. Anmy Tran, a podiatrist. Jackson would relay verbal prescriptions to Sharma, and then Edwards would later email or call with updated prescriptions for more expensive medications.

Beyond Edwards's assisting of Greenbain, the government's evidence at trial also demonstrated that Edwards was a marketer who recruited other individuals to engage in Medicare back billing and to submit prescriptions to Patel's pharmacies. Dinesh Patel, another pharmacist who participated in Babubhai Patel's scheme, testified that he too saw Edwards in Greenbain's home and that he saw Babubhai Patel pay kickbacks to Greenbain in front of Edwards.

Other evidence against Edwards came from a DEA agent, Tyler Parkison, who was a co-case manager for the DEA's investigation of this conspiracy and who worked on the case for over two years. Agent Parkison testified that the government intercepted approximately 11,000 voice/audio calls through wiretaps on Babubhai Patel's cell phones. He also stated that Edwards was named in "[p]robably 30 to 40" of the wiretapped calls and was party to "[p]robably 15 to 25" of the calls.[1] We will address the content of some of these calls below.

The jury convicted Edwards of all three counts. At a pre-sentencing hearing on a motion to withdraw filed by Edwards's attorney, Edwards declared that he wished to proceed pro se. At this hearing, the district court asked the required questions of a defendant who wishes to represent himself, but the hearing ended with Edwards considering the idea of retaining a new attorney for sentencing. The transcript of the sentencing hearing reveals that sometime before

---

[1] Some of the wiretapped calls were not in English, but all of the calls that Edwards addresses on appeal were. For the foreign-language calls, the DEA hired translators who spoke Hindi and Gujarati. The translators summarized the calls, and one of the case agents would review the summaries and request word-for-word transcriptions of calls pertaining to criminal activity. The translators also summarized phone calls that were in English, but other DEA investigators transcribed those calls.

that hearing, Edwards apparently sent a letter to the court reaffirming his desire to represent himself, but that letter is not in the record. At the sentencing hearing, the district court had Edwards confirm this intent, asked further questions about his desire to represent himself, and allowed him to proceed pro se.

At sentencing, Edwards objected to an 18-level enhancement for a loss amount between $2.5 million and $7 million, pursuant to USSG § 2B1.1(b)(1)(J). The district court found that the loss amount was approximately $6 million and overruled the objection. The district court sentenced Edwards to sixty-five months' imprisonment and ordered him to pay $6,067,137 in restitution jointly and severally with all convicted co-defendants. Edwards timely appealed.

## II.

## A.

The first issue Edwards raises on appeal concerns certain opinion testimony of DEA Agent Parkison, who testified about wiretapped calls collected from Patel's phones. Edwards failed to object to the testimony at trial, so we review for plain error the trial court's decision to admit the testimony. *See United States v. Deitz*, 577 F.3d 672, 688 (6th Cir. 2009).

Rule 701 governs lay opinion testimony and requires that the testimony is "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge . . . ." Fed. R. Evid. 701; *see United States v. Freeman*, 730 F.3d 590, 595–96 (6th Cir. 2013). We have held that law-enforcement officers who offer testimony under Rule 701— i.e., by interpreting recorded phone conversations—must specify the personal experiences that led the agent to obtain his or her information. *Freeman*, 730 F.3d at 596. In other words, the agent cannot rely on the general knowledge of the investigation as a whole or of the government

agency investigating the crime in order to support his or her testimony. Rather, the government must lay a proper foundation for the testimony. *Id.* This rule seeks to mitigate the risk "that when an agent 'provides interpretations of recorded conversations based on his knowledge of the entire investigation,' the agent could impermissibly testify 'based upon information not before the jury, including hearsay.'" *United States v. Kilpatrick*, 798 F.3d 365, 380 (6th Cir. 2015) (quoting *Freeman*, 730 F.3d at 596 (citations omitted)).

In *Freeman*, we held that an FBI agent provided an impermissible lay witness opinion when he testified about the meaning of certain phone calls intercepted by wiretap in a murder investigation when the agent "never specified *personal* experiences that led him to obtain his information." *Freeman*, 730 F.3d at 596. Rather, he "relied on the general knowledge of the FBI and the investigation as a whole," such that the jury would have to "trust that he had some information—information unknown to them—that made him better situated to interpret the words used in the calls than they were." *Id.* at 596–97. In fact, the government conceded that the agent did not have "first-hand knowledge required to lay a sufficient foundation for his testimony." *Id.* at 597.

Even where an agent has firsthand knowledge, he may not "spoon-fe[e]d his interpretations of the phone calls and the government's theory of the case to the jury, interpreting even ordinary English language." *Id.*

> An agent qualified as an expert may interpret coded drug language . . . . And a lay witness who has *personal knowledge* of a particular drug or crime conspiracy may similarly testify to the meaning of coded language *within his knowledge*. But a case agent testifying as a lay witness *may not explain to a jury what inferences to draw from recorded conversations involving ordinary language*.

*Id.* at 598 (emphases added) (citing *United States v. Hampton*, 718 F.3d 978, 985 (D.C. Cir. 2013) (Brown, J., concurring)).

**B.**

Edwards contends that Agent Parkison's testimony concerning the wiretapped calls ran afoul of *Freeman* and identifies eight times the testimony may have violated Rule 701. The government replies that all of Agent Parkison's testimony was permissible under *Kilpatrick* in light of his substantial involvement in the case and because it provided useful information to the jury in the form of explaining code words or framing parts of the investigation.

*Kilpatrick* governs here. There, the agents "established a personal-knowledge basis for their lay opinion testimony . . . [by testifying] on multiple occasions concerning his or her years-long personal involvement in the case." 798 F.3d at 381. Additionally, the court found that "few of the challenged statements could be characterized as (1) arguing the government's case or (2) offering interpretations of plain English language." *Id.* For these reasons, the testimony was admissible. *Id.*; *see also United States v. Williamson*, 656 F. App'x 175, 187 (6th Cir. 2016) ("Although [the agent] testified that he had listened to 'over thousands of phone calls' and often used the pronoun 'we' when discussing the investigation, he made clear his active role in the surveillance. . . . He had the firsthand knowledge necessary to give lay opinion testimony."), *cert. denied*, 137 S. Ct. 1119 (2017); *United States v. Smith*, 609 F. App'x 340, 347 (6th Cir. 2015) (holding that agent who "interpreted the conversations based on personal knowledge as opposed to his general involvement in the investigation" gave permissible lay witness testimony). More recently, this court held that the district court did not err by allowing an agent who "testified numerous times to his personal involvement in the investigation" to interpret wiretapped phone calls. *United States v. Young*, 847 F.3d 328, 351 (6th Cir. 2017).

Like the agent in *Kilpatrick*, Agent Parkison testified that he was intimately involved in the investigation. He was a co-case manager for the DEA's investigation, and he worked on this

matter for over two years. During that time, he reviewed the summaries of 11,000 wiretapped calls, ordered transcriptions of relevant calls, reviewed those transcripts, and listened to many calls. His personal involvement in this case was sufficient to establish his ability to interpret the wiretapped phone calls. The district court did not commit plain error in admitting the testimony.

Whether the agent was personally involved in the investigation does not end our inquiry. An agent may "be helpful when she uses her personal knowledge of the case to interpret cryptic language . . . [b]ut a case agent testifying as a lay witness 'may not explain to a jury what inferences to draw from recorded conversations involving ordinary language' because this crosses the line from evidence to argument." *Kilpatrick*, 798 F.3d at 380–81 (quoting *Freeman*, 730 F.3d at 598). Therefore, we must also assess the testimony to determine, for example, whether it explained what inferences the jury should draw, argued the government's case, interpreted plain language, or otherwise crossed the line from opinion to argument.

Having reviewed the testimony of which Edwards complains, we find that Agent Parkison did not cross this line. Agent Parkison interpreted words unique to the investigation and deciphered ambiguous statements in a way that was useful to the jury. This testimony, based on his perception as the case agent, was permissible under Rule 701.

As a preliminary matter, Edwards provides very little argument as to *how* any of the complained-of testimony violates the rules established in *Freeman* and *Kilpatrick*. For most of the testimony about which he complains, he simply asserts that the government asked Agent Parkison to interpret portions of the wiretapped calls, which we have found to be permissible here. Edwards implies that some of the testimony was tantamount to "spoon-feeding" the government's theory of the case to the jury, or that the agent summarized what inferences to draw from a particular call. For example, in one call, Patel tells Edwards that he views Edwards

as a "super marketer," and Agent Parkison explains that "[a] marketer is someone who recruited patients to fill their prescriptions at pharmacies controlled by Babubhai Patel." This was not spoon-feeding a theory; it was an explanation of a term and was useful to help the jury understand what a marketer was in this conspiracy and how Edwards fulfilled that role.

Similarly, in another call, Edwards and Patel discuss opening a "sleep clinic," and Edwards says that a third party will "take the money from the sleep clinic versus the rent because it'll be more money . . . ." When asked what Edwards and Patel were discussing, Agent Parkison explained: "The two options are, is they're discussing in this building that Dr. Pediway is in that they are going to start a sleep clinic. And instead of paying Dr. Pediway through the rent, that they'll just pay him—he'll just receive some of the profits from the sleep clinic as his payment for it." This is not an improper interpretation, because Agent Parkison was providing an explanation of the context and meaning of the conversation in light of his work on the investigation, which is permissible under *Kilpatrick*. And he was not instructing the jury what inference to draw from the wiretapped call, because he was simply explaining what Edwards meant when he said this to Patel. Comparing Agent Parkison's words with Edwards's words demonstrates that Agent Parkison was interpreting the meaning, not adding some sort of impermissible gloss that pushed the jury in the direction the government wanted it to go.

We hold that in those instances where Edwards simply points to testimony and claims that Agent Parkison was interpreting it, there was no error in the admission of the testimony, especially in light of the lack of any contemporaneous objection by defense counsel

Even where Edwards does specifically argue error in the admission of the opinion testimony, we detect none. For example, the government played a wiretapped call between Edwards and Patel in which they discuss recruiting physicians' assistants into the scheme. Patel

says, "we want . . . scripts and we gonna work it, and we gonna help then that too, like Greengain [sic] right?" The government asked Agent Parkison what it meant to work "like Greenbain," and he replied that the physicians' assistants "will provide their prescriptions to pharmacies controlled by Babubhai Patel to be filled, like Dr. Greenbain is doing." Edwards contends that Agent Parkison's explanation of the phrase was feeding the government's theory of the case to the jury. Not so. The meaning of "like Greenbain" is not inherently clear, and it was permissible for Agent Parkison to explain his understanding of its meaning—based on his investigation—to the jury.

Finally, Edwards refers to two instances when Agent Parkison indicated that he can interpret the calls better than others. Edwards argues that the agent's implication is that he has background context that others—including the jurors—do not. In *Freeman*, we held that an agent's testimony implying that the agent "had some information" unknown to the jury "that made him better situated to interpret the words used in the calls than they were" violated Rule 701. 730 F.3d at 597. But, we explained, this was because "the jury had no way of verifying his inferences or of independently assessing the logical steps he had taken" when the agent "failed to explain the basis of his interpretations . . . and therefore failed to lay a foundation under Rule 701." *Id.* This is not the case here. As we have explained, Agent Parkison did lay the necessary foundation for providing his opinion on the calls. Although we would not condone the regular practice of agents implying that they have hidden context that the jury does not, we find that there was no plain error in this instance. This is particularly so here, where the testimony to which Edwards objects was elicited through cross-examination by Edwards's co-defendant and seems to have been intended either to attack the foundation for Agent Parkison's testimony or to

impeach his credibility as a witness. We therefore conclude that it was not plain error to admit this testimony, and we need not reach the parties' dispute concerning the invited error doctrine.

## II.

### A.

Edwards next complains that the district court erred in allowing him to represent himself at sentencing. This court has not clearly defined the standard of review for a trial court's decision allowing the waiver of counsel. *See, e.g.*, *United States v. Carmichael*, 676 F. App'x 402, 407–08 (6th Cir. 2017) (explaining that we have used both plain error and "a standard akin to de novo review" for appellate review of a district court's decision to allow waiver of counsel). We need not resolve this conflict here, because, as in *Carmichael*, Edwards's argument fails under either standard of review.

Before a defendant may exercise his right to self-representation, we require the district court to ensure that the defendant is knowingly and voluntarily waiving his right to counsel. *See Faretta v. California*, 422 U.S. 806, 833–34 (1975); *United States v. Cromer*, 389 F.3d 662, 680 (6th Cir. 2004). "[T]o ensure that a defendant's waiver of counsel is knowing and intelligent," we require the district court to engage in a *Faretta* inquiry, essentially a series of questions from the Bench Book for United States District Court Judges. *Cromer*, 389 F.3d at 680; *United States v. Evans*, 559 F. App'x 475, 480 (6th Cir. 2014). "Substantial compliance with this series of questions is sufficient." *Cromer*, 389 F.3d at 680. This substantial compliance standard means that the district court need not conduct a formal inquiry consisting of all thirteen questions plus the admonition against self-representation. Rather,

> [W]e have reviewed a district judge's *Faretta* inquiry on appeal by focusing on whether the judge addressed the relevant considerations behind the model inquiry, such as the defendant's familiarity with the law, . . . the gravity of the charges and the dangers of self-representation, and whether the defendant's decision to waive

-11-

counsel is voluntary. Where the record shows that the defendant kn[ew] what he [wa]s doing and his choice [wa]s made with eyes open, we have found the *Faretta* inquiry adequate.

*United States v. Bankston*, 820 F.3d 215, 224 (6th Cir. 2016) (alterations in original) (internal citations and quotations omitted). In *Bankston*, where we stated that literal adherence to the Bench Book questions is not a requirement, the district court had asked only three of the questions, but nevertheless satisfied the "relevant considerations." *Id.*

**B.**

The district court did not err in allowing Edwards to represent himself.[2] At a motion for withdrawal of counsel, Edwards expressed his desire to represent himself in his sentencing hearing. The district court consulted a list of *Faretta* questions, proceeded to ask Edwards the relevant questions (for example, omitting questions that applied only at the trial stage), and indicated that "representing yourself is not easy to do." Further, the court urged Edwards to work with his stand-by counsel in reviewing the PSR and to reconsider his decision to represent himself. At his sentencing hearing several months later, Edwards reiterated that he wanted to proceed pro se. The district court cautioned Edwards against self-representation: "You understand being sentenced is a difficult time especially if you are the one being sentenced. And you have, first of all, a right to counsel. And if you can't afford one, one would be provided for you for sentencing? Do you understand that?" Eventually, after further questioning Edwards, the court said, "I find that you are voluntarily waiving your right to counsel and you are obviously an intelligent person who understands the consequences." By itself, the fact that this *Faretta* hearing took place across two different days is not erroneous. *Cf. United States v. Ross*,

---

[2] In his opening brief, Edwards argues that the district court failed to ask any of the *Faretta* questions. Apparently, he neglected to order and to consider a hearing transcript that recorded the district court's asking the relevant questions. The government points out this oversight, which Edwards concedes in his reply brief while maintaining that the district court erred.

703 F.3d 856, 868 (6th Cir. 2012) ("Although the court did not ask Ross each of these questions again at the June 16 hearing on Ross's second motion, the answers to those particular questions likely would not have changed in the intervening two weeks, and the court referred to them in its findings at the latter hearing.").

The government argues that the *Faretta* hearing addressed the "relevant considerations" identified by *Bankston*. We agree. First, the district court determined that Edwards had no legal training but that he was highly educated and "felt qualified and thought it was in his best interest" to proceed pro se. Second, Edwards was aware of the gravity of the charges against him in light of an acknowledgment he signed at his arraignment, the information contained in the PSR that he confirmed he had read, and his confirmation to the district court that he understood the crimes charged against him. Third, the district court ensured that Edwards understood the dangers of representing himself, and it repeated this admonition at both hearings where Edwards sought leave to proceed pro se. Fourth, the district court asked questions to ensure that Edwards's desire to represent himself was voluntary. Accordingly, we find that the district court properly assessed Edwards's desire to represent himself, asked him the proper questions under *Faretta*, and did not err in finding that he made a voluntary, intelligent waiver of his right to counsel.

## III.

### A.

Edwards's next argument on appeal is that the district court erred by adopting the loss amount set forth in his PSR. The procedural reasonableness of a sentence is reviewed for abuse of discretion. *See United States v. Rios*, 830 F.3d 403, 435 (6th Cir. 2016). The amount-of-loss determination is reviewed for clear error, but the methodology for determining loss is reviewed

de novo. *See United States v. Warshak*, 631 F.3d 266, 328 (6th Cir. 2010). The government must prove the loss "by a preponderance of the evidence," and the district court "'need only make a reasonable estimate of the amount.'" *United States v. Jones*, 641 F.3d 706, 712 (6th Cir. 2011) (quoting USSG § 2B1.1, comment. (n.3(C)). The district court "does not have to establish the value of the loss with precision; it simply needs to publish the resolution of the contested factual matters that formed the basis of the calculation." *United States v. Poulsen*, 655 F.3d 492, 513 (6th Cir. 2011) (citation and internal quotation marks omitted).

"When a defendant fails to produce any evidence to contradict the facts set forth in the PSR, a district court is entitled to rely on those facts when sentencing the defendant." *United States v. Geerken*, 506 F.3d 461, 467 (6th Cir. 2007). Moreover, a district court may use the "'aggregate dollar amount of fraudulent bills submitted to' Medicare . . . [as] 'prima facie evidence of the amount of intended loss . . . if not rebutted.'" *United States v. Behnan*, 554 F. App'x 394, 400 (6th Cir. 2014) (quoting USSG § 2B1.1, comment. (n.3(F)(viii))).

Under the Federal Rules of Criminal Procedure, the district court "may accept any undisputed portion of the presentence report as a finding of fact," but it "must—for any disputed portion of the presentence report or other controverted matter—rule on the dispute . . . ." Fed. R. Crim. P. 32(i)(3)(A)–(B). Where the parties contest the loss amount, "the court must explain its calculation methods." *Poulsen*, 655 F.3d at 512. "[O]ur analysis proceeds as follows: (1) whether the amount was in dispute; (2) if it was in dispute, whether the district court adequately ruled on the disputed amount; and (3) if the district court ruled, whether the factual findings indicate clear error." *Id.* at 513.

**B.**

Edwards's PSR stated that the loss amount to Medicare, Medicaid, and Blue Cross/Blue Shield was $6,067,137. Edwards objected to this loss amount on the ground that even if it were the amount of loss Greenbain caused, it did not mean that Edwards himself was responsible for this loss. Although Edwards did not produce any rebuttal evidence concerning the proper amount, the district court entertained his objection to the PSR's loss amount and found that the amount was appropriate in light of the jury conviction. At sentencing, the government explained that because the evidence demonstrated that Greenbain and Edwards were "very closely associated with each other," the government was seeking to hold Edwards "accountable only for the losses associated with Doctor Greenbain and Doctor Greenbain's fraudulent prescriptions and fraudulent submissions to the Medicare program for services he allegedly applied for." Edwards's argument at sentencing was essentially that "[t]here was no evidence," that "most of the information was speculation," and that "[n]ot one of the witnesses were aware as to why I was even involved or how or why I was even involved in the conspiracy." The district court disagreed: "I have to respect what the jury found . . . And under the laws of the Sixth Circuit and the conspiracy laws, you are responsible at least for what [Dr.] Greenbain did." The court overruled the objection and stated, "the [loss] amount will remain at six million which is at the high end of the [18-level]" enhancement.

Edwards argues on appeal that the district court erred by using the PSR's loss amount of $6,067,137 without making a finding of fact. He asserts four problems: (1) the government was inconsistent in its own sentencing memorandum concerning the loss amount, and none of these numbers matched the final amount set by the court; (2) Edwards joined the conspiracy after Greenbain, so he should not be held responsible for the full amount of Greenbain's acts;

(3) some of Greenbain's acts were not foreseeable to Edwards; and (4) it is unclear whether all of Greenbain's prescriptions were fraudulent. As the government notes on appeal, Edwards failed to raise in the district court these claims of error in the method of calculating the loss amount.

Although we construe Edwards's pro se objection liberally, we nevertheless conclude on these facts that his objection to the loss amount was not based on that amount's calculation as much as it was an argument that he was innocent or that he should not be responsible for the same amount as Dr. Greenbain, another member of the conspiracy. That is precisely what the district court addressed when overruling the objection, thereby satisfying Rule 32. Even if we assume that Edwards placed the loss amount in dispute—the first step of the three-step *Poulsen* analysis—the district court adequately ruled on the dispute by reiterating that a convicted member of a conspiracy is liable for the foreseeable acts of another member of the conspiracy. *See United States v. Gravier*, 706 F.2d 174, 177–78 (6th Cir. 1983). Finally, it was not clear error to accept the loss amount set forth in the PSR when Edwards presented no rebuttal evidence in support of his position. *See Geerken*, 506 F.3d at 467.

## IV.

Finally, Edwards argues that the district court erred by using the loss amount to determine the amount of restitution, relying on the same reasons he used for his loss-amount argument. Because we affirm the loss calculation for purposes of his Guidelines sentencing range, we also hold that it was not an abuse of discretion for the district court to use that same amount when calculating Edwards's restitution amount. *Cf. Behnan*, 554 F. App'x at 400.

## V.

For the foregoing reasons, we AFFIRM Edwards's conviction and sentence.