NOT RECOMMENDED FOR PUBLICATION

File Name: 20a0465n.06

No. 19-5942

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

**FILED**

Aug 05, 2020
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE MIDDLE DISTRICT OF |
| TRAVIS LAMONT SUGGS, | ) | TENNESSEE |
| | ) | |
| Defendant-Appellant. | ) | |

BEFORE: SUTTON, COOK, and MURPHY, Circuit Judges.

MURPHY, Circuit Judge. Travis Suggs agreed to sell Jedidiah Pride a half-pound of methamphetamine at a park-and-ride lot just outside Clarksville, Tennessee. What Suggs did not know is that Pride was a police informant who had been fitted with a wire. While conversing in Suggs's car, the two made statements commonly associated with drug deals, such as "You said half a pound, right?" and "Not no shake." When the police blocked in Suggs's car, he fled on foot. Officers apprehended him and found over 300 grams of methamphetamine in the car. A jury convicted Suggs of illegally possessing methamphetamine with intent to distribute it. The district court sentenced him to 151 months in prison. Suggs now asserts, among other claims, that the police lacked probable cause to block his car, that an officer was wrongly permitted to opine on common drug-dealing practices, that the jury was given an improper instruction about Suggs's

flight from police, and that the district court failed to account for various factors when sentencing him. Finding his arguments without merit, we affirm Suggs's conviction and sentence.

I

In March 2018, Clarksville police officers came to suspect that Travis Suggs was a significant drug dealer in Nashville. Almost a year earlier, officers had arrested Jedidiah Pride, a Clarksville drug dealer, while he was in possession of over two pounds of methamphetamine and three guns. Near the end of 2017, Pride began cooperating with law enforcement in the hopes of receiving a reduced sentence. Over the next few months Pride gave little useful information to his contact at the Clarksville Police Department—Officer Robert Del Giorno. But Pride informed Del Giorno about Suggs in early March.

Pride learned about Suggs's drug dealing from a friend. Before meeting Suggs, Pride told Del Giorno that his friend had connected him with a potential "big fish." Pride met Suggs at his friend's home, and they discussed a methamphetamine transaction. After that meeting, Pride texted Del Giorno that Suggs was not an average seller, but "the guy selling it to the guy that is selling it to the everyday Junkie." Del Giorno looped in Agent Alex Goldberg of the Tennessee Bureau of Investigation and federal DEA agents to assist with the investigation.

On March 14, Del Giorno arranged for Pride to call Suggs from the police station while Del Giorno and Goldberg listened in. During the call, Pride and Suggs continued their efforts to set up a drug deal. Without expressly referring to methamphetamine, Suggs asked if Pride "wanted the big one or the little one." Pride responded that he would like to buy a half-pound: "just a L-B, you know what I'm saying, half a, half of that." If Pride's customers were satisfied, Pride added, the two could "start breaking bread" on a regular basis.

Under the direction of the police, Pride eventually scheduled this transaction for March 21 at a McDonald's off the interstate outside Clarksville. Around 5:00 p.m. that day, the police met Pride to walk him through the controlled buy and fit him with a wire. Agent Goldberg gave Pride $3760 to buy the drugs. The officers told Pride that they were going to let Suggs leave with the money because they wanted to conduct a deeper investigation into Suggs's suppliers.

But they were in for a surprise. When the police told Pride that they needed to search his truck before the buy, Pride responded that he had brought a handgun. To make matters worse, the police found methamphetamine inside. Pride's decision to bring a gun and drugs to a controlled buy shocked the officers. They concluded that they could not use Pride as an informant again and that he had ruined any larger investigation into Suggs. But they chose to proceed with this one buy after discussions with a federal prosecutor. Without telling Pride, they changed the plan from a "buy walk" (in which Suggs would leave with the money) to a "buy bust" (in which Suggs and Pride would be arrested on the spot). Given the increased risks with busts, the police had Pride switch the location from the McDonald's to a less crowded park-and-ride lot down the street. Claiming to have seen a cop at the McDonald's, Pride texted Suggs to meet him at that lot.

Pride drove his truck to the park-and-ride lot; Goldberg and Del Giorno followed in Goldberg's truck (and other officers were at or near the location in unmarked cars). Pride and the police were situated by about 6:45 p.m. Suggs arrived fifteen minutes later in a rented Nissan and texted Pride to get into his car. Pride's wire allowed the police to hear their conversation, but Goldberg and Del Giorno could not see what was happening inside Suggs's car.

When Pride entered the Nissan, he saw methamphetamine in a bag in Suggs's lap. The police heard Pride immediately state, "that's some of that fire-ass smoke[.]" Suggs then asked: "You said half a pound, right?" Pride responded, "Yes sir" and continued "I can hear that shit.

3

That shit sounds good." Suggs, shaking the bag, responded: "All of it like this. Not no shake." The police could hear a rustling noise. Pride later explained that the noise sounded like glass or crystal shaking and that Suggs's "no shake" comment meant that there were no smaller pieces breaking off the larger shards of methamphetamine.

At this point, the officers believed that a drug deal was occurring. Goldberg drove his truck to block in Suggs's Nissan, and Del Giorno activated the flashing blue lights. Suggs quickly jumped out of his car and fled on foot. Goldberg gave chase, yelling "Police. Stop." As Suggs ran by an unmarked DEA vehicle, an agent opened the door. Suggs "bounced off" the door, which allowed another officer to gain ground on him. Concerned that Suggs might have a gun, this officer reached out and struck Suggs in the back of the head with his rifle's flashlight (which extended past its muzzle). That action caused them both to tumble to the ground. The officer secured Suggs while Goldberg watched to ensure he did not have a weapon. Meanwhile, Del Giorno pulled Pride out of the Nissan and arrested him too.

The officers recovered over 300 grams of methamphetamine from the Nissan: 228 grams in a bag on the passenger side of the car and 87 grams in another bag on the driver's side. They also found a couple grams of marijuana in the car.

The government indicted Suggs for possessing with the intent to distribute 50 grams or more of methamphetamine, in violation of 21 U.S.C. § 841(a)(1). Before trial, Suggs moved to suppress the drugs on the ground that the police lacked probable cause when they blocked in his car to arrest him. The court denied the motion.

Suggs stood trial. His counsel presented the defense theory that Suggs and Pride had agreed to a deal involving the marijuana found in the Nissan and that Pride had planted the methamphetamine. Counsel noted how Suggs and Pride never used the word "methamphetamine" in their

texts or calls. Before the deal, counsel also claimed, the police did not search Pride carefully. And counsel highlighted that Pride's testimony alone connected the deal to methamphetamine rather than marijuana. So counsel attempted to eviscerate Pride's credibility, which had already been damaged by his bringing a firearm and drugs to the controlled buy. Counsel highlighted Pride's incentive to cooperate, noting that he had received only a three-year prison sentence (plus eight years' probation) on a single state-law charge stemming from his 2017 arrest. Finally, Suggs is African American, while Pride is white. Counsel impeached Pride with his racist views, getting him to opine, for example, that the Aryan Nation "isn't racist at all."

Despite counsel's efforts, the jury convicted Suggs of possessing with intent distribute at least 50 grams of methamphetamine. The district court sentenced him to 151 months in prison, to be followed by five years of supervised release.

## II

Suggs raises five issues on appeal. He argues that the district court erred by (1) finding probable cause for his arrest and the search of his car; (2) admitting opinion testimony regarding common drug-dealing practices and the meaning of his recorded conversation with Pride; (3) providing a jury instruction about Suggs's flight; (4) allowing improper prosecutorial comments during closing argument; and (5) failing to consider important factors at sentencing.

### A. Probable Cause

Suggs first argues that his arrest and the search of his car were not supported by probable cause, requiring the suppression of the drugs. The Fourth Amendment bars "unreasonable searches and seizures." U.S. Const. amend. IV. An arrest and a temporary stop of a car are both "seizures" within the meaning of the Fourth Amendment. *District of Columbia v. Wesby*, 138 S. Ct. 577, 585 (2018); *Brendlin v. California*, 551 U.S. 249, 255 (2007). To be reasonable, a warrantless public

arrest requires "probable cause." *Wesby*, 138 S. Ct. at 586. But the temporary stop of a car requires only "reasonable suspicion." *Heien v. North Carolina*, 574 U.S. 54, 60 (2014).

The facts of this case raise several interesting Fourth Amendment issues under these rules. First up: Did Goldberg and Del Giorno "seize" Suggs and trigger the Fourth Amendment when they initially blocked in his Nissan? Probably not. Their actions likely qualified as only an *attempted* seizure. "[T]here is no seizure without actual submission," and Suggs jumped out of the car and ran. *Brendlin*, 551 U.S. at 254; *California v. Hodari D.*, 499 U.S. 621, 624 (1991); *United States v. Jones*, 562 F.3d 768, 773–74 (6th Cir. 2009). Next: May we consider Suggs's flight as an additional factor in deciding whether the police had a "reasonable" basis to "seize" him? Likely so. At least when the police have not already seized an individual, the individual's attempt to flee offers further grounds for a seizure. *See United States v. Price*, 841 F.3d 703, 706 (6th Cir. 2016); *see also Illinois v. Wardlow*, 528 U.S. 119, 124–25 (2000). Last: If Goldberg and Del Giorno did "seize" Suggs by blocking in his Nissan, what level of suspicion was required to do so—probable cause or reasonable suspicion? Likely just reasonable suspicion. While the police need probable cause when a temporary seizure ripens into a full arrest, *United States v. Jacob*, 377 F.3d 573, 578–80 (6th Cir. 2004), the stop of a car generally requires only reasonable suspicion, *Heien*, 574 U.S. at 60. And the Fourth Amendment's rules typically turn on the objective facts, not on the officers' subjective intentions. *See Whren v. United States*, 517 U.S. 806, 813 (1996).

But we need not definitively resolve any of these questions. That is because Goldberg and Del Giorno also had probable cause to arrest Suggs and search his Nissan even *when* Goldberg blocked in Suggs's car. Probable cause to arrest requires "a reasonable ground for belief" in the guilt of the person to be seized, *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (citation omitted), whereas probable cause to search requires a reasonable ground to believe that evidence of a crime

will be located at the place to be searched, *Florida v. Harris*, 568 U.S 237, 243 (2013); *see also Greene v. Reeves*, 80 F.3d 1101, 1106 (6th Cir. 1996). In either context, probable cause is a "practical, nontechnical conception" that deals with "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Illinois v. Gates*, 462 U.S. 213, 231 (1983) (citation omitted). This standard examines the "totality of the circumstances" known to the officers when they acted. *Wesby*, 138 S. Ct. at 586 (citation omitted).

Consider the circumstances that Goldberg and Del Giorno knew: Pride had told them that Suggs was a potentially significant drug dealer and that the two had attempted to arrange a methamphetamine deal. The police corroborated Pride's information by listening to a phone conversation in which Suggs and Pride used drug-dealing lingo. Suggs asked if Pride wanted "the big one or the little one," and Pride responded by asking for "half" an "L-B." The police then coordinated with Pride to set up this deal on a specific date at a specific location. Suggs showed up at the appointed time and place. Lastly, during the deal itself, the police heard Suggs and Pride converse in a way that suggested drugs were in the car. Pride referenced "fire-ass smoke" on entering the car, which suggested to the experienced officers that drugs were present. Suggs then asked Pride, "You said half a pound, right?," seemingly confirming the two men were engaged in the deal they had discussed earlier. Suggs next referred to "shake," a common term used with methamphetamine. The officers also could hear the physical shaking. Taken together, these facts gave the officers "reasonable grounds to believe that [Suggs] was committing a violation of the laws of the United States relating to narcotic drugs" so as to permit his arrest. *Draper v. United States*, 358 U.S. 307, 314 (1959). And the facts gave them reasonable grounds to believe that those drugs were in Suggs's car so as to permit the officers' search. *Harris*, 568 U.S at 243.

Suggs raises two counterarguments. He says the district court wrongly relied on his flight from the police because they had already arrested him (and triggered the Fourth Amendment's probable-cause requirement) when they blocked in his car. For the reasons explained, we have our doubts. *See Jones*, 562 F.3d at 773–74. But it does not matter. The police had probable cause to arrest Suggs even without considering his flight from police.

Suggs next argues that Pride was too unreliable to provide probable cause because he "had a track record of giving useless information" and a "strong motivation to get Suggs arrested." Yet the officers independently corroborated much of the information that Pride had given them before arresting Suggs. *Cf. Draper*, 358 U.S. at 313–14. They did not rely on Pride's word alone. The district court thus correctly denied Suggs's motion to suppress.

## B. Opinion Testimony

Suggs next argues that the district court wrongly allowed the officers to give their opinions about Suggs's use of a rental car and about the meaning of his March 14 call with Pride. At trial, Goldberg opined that it is "a very commonplace practice" for drug dealers to use rental cars during drug deals so that their personal cars will not be subject to forfeiture if they are arrested. Over Suggs's objections, Goldberg and Del Giorno also testified about their understanding of what Suggs and Pride had discussed during their call. We generally review the admission of evidence for an abuse of discretion. *United States v. Lopez-Medina*, 461 F.3d 724, 741 (6th Cir. 2006). Because Suggs failed to object to the rental-car testimony, we review its admission for plain error. *United States v. Ledbetter*, 929 F.3d 338, 348 (6th Cir. 2019). Suggs has failed to prove that the district court wrongly admitted either kind of evidence.

*Rental-Car Testimony*. Suggs has not shown any "plain" error from Goldberg's testimony about the common use of rental cars in drug deals. *See id.* "A witness may testify based on

8

opinion, as opposed to testifying to facts about which he has direct knowledge, under two circumstances: as a lay person under Rule 701 or as an expert under Rule 702" of the Federal Rules of Evidence. *United States v. Freeman*, 730 F.3d 590, 595 (6th Cir. 2013). Suggs argues that Goldberg was not qualified as an "expert" and so his rental-car remark amounted to an improper "lay" opinion about matters outside his knowledge. But Suggs's premise is wrong: Under plain-error review, we find that the district court could reasonably conclude that Goldberg was an expert.

Rule 702 allows "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education" to "testify in the form of an opinion" so long as certain factors are met. Fed. R. Evid. 702(a)–(d). "Courts generally have permitted police officers to testify as experts regarding drug trafficking as long as the testimony is relevant and reliable." *United States v. Johnson*, 488 F.3d 690, 698 (6th Cir. 2007); *see United States v. Maya*, __ F.3d __, 2020 WL 4048038, at *8–9 (6th Cir. July 20, 2020). Here, the court would not have plainly erred in concluding that the government asked enough "qualifying and foundational questions" under Rule 702 to allow Goldberg to give an expert opinion. *Johnson*, 488 F.3d at 698. The government, among other things, established that Goldberg had about four years of narcotics experience with the Tennessee Bureau of Investigation.

Relying on *United States v. Figueroa-Lopez*, 125 F.3d 1241, 1245 (9th Cir. 1997), Suggs responds that the government never *formally* sought to qualify Goldberg as an expert. Yet, no matter what the Ninth Circuit requires, our precedent holds that a district court should *not* certify a witness as an expert in front of the jury because it could unduly bolster the witness in the jury's eyes. *Johnson*, 488 F.3d at 697–98; *see United States v. King*, 339 F. App'x 604, 610–11 (6th Cir. 2009). We have instead said that "the proponent of the witness should pose qualifying and foundational questions and proceed to elicit opinion testimony." *Johnson*, 488 F.3d at 698. Only if

"the opponent objects," we have added, should the court "rule on the objection" and "allow[] the objector to pose *voir dire* questions to the witness's qualifications[.]" *Id.*; *Maya*, 2020 WL 4048038, at *9; *Ledbetter*, 929 F.3d at 348–49. The district court thus did not commit plain error in allowing Goldberg to testify about the use of rental cars.

(We add two disclaimers. Suggs has raised no argument on appeal that the government failed to properly disclose Agent Goldberg as an expert before trial, *see* Fed. R. Crim. P. 16(a)(1)(G); *Ledbetter*, 929 F.3d at 350, and he has raised no argument that the district court failed to give proper jury instructions concerning Goldberg's dual roles as an opinion and fact witness, *see Lopez-Medina*, 461 F.3d at 743–45. We thus do not consider these matters.)

*March 14 Call*. Suggs also has not shown that the district court abused its discretion in allowing Del Giorno and Goldberg to express their views about the March 14 conversation between Pride and Suggs. Suggs points to the following statement from Del Giorno: "From my recollection of the call, everything was agreed upon for as far as the price, the amount, and just we didn't have a location where we were going to meet on that call." And Suggs notes that Goldberg stated his view that the proposed drug deal was for methamphetamine and that, "[a]ccording to the call, it was set up for a half a pound, and then we agreed on a price—they agreed on a price too."

Our caselaw provides two grounds on which police may give opinions about phone conversations. We have noted that police officers may testify "as *expert* witnesses under Federal Rule of Evidence 702" and "interpret intercepted conversations that use 'slang, street language, and the jargon of the illegal drug trade.'" *United States v. Young*, 847 F.3d 328, 350 (6th Cir. 2017) (quoting *United States v. Kilpatrick*, 798 F.3d 365, 379 (6th Cir. 2015)) (emphasis added). And we have noted that an officer may give a *lay* opinion about a conversation if the "officer is a participant in the conversation, has personal knowledge of the facts being related in the conversation, or

10

observed the conversations as they occurred." *United States v. Williamson*, 656 F. App'x 175, 187 (6th Cir. 2016) (quoting *Kilpatrick*, 798 F.3d at 379). This latter type of evidence must satisfy Federal Rule of Evidence 701, which requires the lay opinion to be "rationally based on the witness's perception," "helpful to clearly understanding the witness's testimony or to determining a fact in issue," and "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701(a)–(c).

Here, the district court did not abuse its discretion in concluding that Del Giorno and Goldberg could give limited *lay* testimony about the March 14 call. Having asked Pride to come to the police station for the call, the officers listened to the conversation. *See Williamson*, 656 F. App'x at 188. And their modest testimony about the call (that Pride and Suggs had set up the deal's price and quantity) essentially summarized their "interpretations of ambiguous phrases." *Id.* at 187–88. Pride, for example, had requested "half" an "L-B" and asked "what's the ticket on that bad boy gonna be?" *Cf. United States v. Edwards*, 707 F. App'x 332, 338 (6th Cir. 2017).

Suggs counters that this testimony was like the testimony we rejected in *Freeman*. There, we noted that, because of hearsay concerns, officers cannot simply rely on their general knowledge of an investigation as a whole to interpret dozens of recorded conversations that they reviewed only after the fact. *Freeman*, 730 F.3d at 596–97. Nothing of the sort happened here. Del Giorno and Goldberg made generic statements about a single conversation that they heard firsthand.

### C. Jury Instruction

Suggs also challenges a jury instruction suggesting that his flight from the police might indicate his consciousness of guilt. The district court instructed the jury:

11

You have heard testimony in this case that after the crime was supposed to have been committed, the defendant allegedly fled from law enforcement at the scene of the incident.

If you believe that the defendant fled, then you may consider this conduct, along with all the other evidence, in deciding whether the government has proved beyond a reasonable doubt that he committed the crime charged. This conduct may indicate that he thought he was guilty and was trying to avoid punishment. On the other hand, sometimes an innocent person may flee for some other reason. The defendant has no obligation to prove that he had an innocent reason for his conduct.

We review preserved challenges to a flight instruction for an abuse of discretion. *United States v. Carter*, 236 F.3d 777, 792 n.11 (6th Cir. 2001).

As our model jury instructions suggest, *see* Sixth Circuit Pattern Jury Instruction 7.14, we have long allowed a district court to instruct the jury that a defendant's flight suggests guilt. *See, e.g.*, *United States v. Dye*, 538 F. App'x 654, 664–65 (6th Cir. 2013); *United States v. Wilson*, 385 F. App'x 497, 501–02 (6th Cir. 2010); *United States v. Swain*, 227 F. App'x 494, 497–98 (6th Cir. 2007) (per curiam); *United States v. Oliver*, 397 F.3d 369, 376–77 (6th Cir. 2005); *United States v. Ward*, 1998 WL 45491, at *6–7 (6th Cir. Jan. 27, 1998); *United States v. Dillon*, 870 F.2d 1125, 1126–29 (6th Cir. 1989); *United States v. Touchstone*, 726 F.2d 1116, 1118–20 (6th Cir. 1984).

Following the Fifth Circuit's (somewhat belabored) inferential chain, we have noted that this flight evidence is proper if "four inferences can be drawn: (1) from the defendant's behavior to flight; (2) from flight to consciousness of guilt; (3) from consciousness of guilt to consciousness of guilt concerning the crime charged; and (4) from consciousness of guilt concerning the crime charged to actual guilt of the crime charged." *Dillon*, 870 F.2d at 1127 (quoting *United States v. Myers*, 550 F.2d 1036, 1049 (5th Cir. 1977)); *see Oliver*, 397 F.3d at 376. More succinctly, the evidence must allow the jury to infer that a defendant fled from the police because of the defendant's knowledge of guilt of the specific crime at issue.

Here, the district court did not abuse its discretion in giving this flight instruction. Plenty of evidence showed that Suggs knowingly ran. Del Giorno and Goldberg (among others) testified that Suggs fled from the police when they pulled behind his car and continued to run when they shouted stop. And plenty of evidence supported the inference that Suggs ran *because* he recognized he had been caught in an illegal methamphetamine deal. *See Dillon*, 870 F.2d at 1128; *see also Wardlow*, 528 U.S. at 124. That evidence included the call between Pride and Suggs, Pride's testimony that they were at the park-and-ride lot for a methamphetamine deal, and (not least of all) the 300 grams of methamphetamine in Suggs's car. *See Dillon*, 870 F.2d at 1127–28.

In response, Suggs argues that this instruction was flawed because his flight from the police was equally consistent with his theory (that he was guilty of only a marijuana deal) as it was with the government's (that he was guilty of the methamphetamine deal). Yet the conclusion that Suggs fled because he knew he was guilty of a methamphetamine crime "need not be the *only* permissible inference" before a district court may give this flight instruction. *Wilson*, 385 F. App'x at 502. To the contrary, *Wilson* upheld such an instruction even though the defendant argued that his flight was equally consistent with his defense that he was an innocent bystander running from gunfire. *See id.*; *see also Touchstone*, 726 F.2d at 1118–19. Here, sufficient evidence existed for the jury to make the necessary inferences. Our precedent requires nothing more.

### D. Prosecutorial Misconduct

Suggs next argues that, during closing arguments, the prosecutors committed misconduct by wrongly (1) opining on his failure to testify, (2) criticizing his decision to stand trial, and (3) impugning defense counsel. Suggs faces a difficult task to obtain a reversal on these grounds. Defendants generally must show that a prosecutor's comments were not just improper but flagrantly so. *United States v. Gonzalez*, 512 F.3d 285, 292 (6th Cir. 2008). That will always be difficult to

do because we "afford 'wide latitude to a prosecutor during closing argument[.]'" *United States v. Boyd*, 640 F.3d 657, 669 (6th Cir. 2011) (citation omitted). It is even more difficult for Suggs because he failed to object to the comments and we review his claim only for plain error. That standard makes our review "doubly deferential," *United States v. Al-Maliki*, 787 F.3d 784, 795 (6th Cir. 2015), requiring Suggs to show that the prosecutors' statements were "exceptionally" flagrant, *Gonzalez*, 512 F.3d at 292 (citation omitted). He cannot meet this test.

Start with Suggs's claim about his failure to testify. He is correct that, according to the Supreme Court, the Fifth Amendment bars prosecutors from commenting on a defendant's decision not to testify. *Griffin v. California*, 380 U.S. 609, 615 (1965). But he is wrong that the prosecutors in this case did so in any flagrant way. Suggs notes that a prosecutor said: "I'd submit to you there are two people who had something to gain or lose from this case. And you judge the credibility of what they said." He adds that this prosecutor later argued: "There's been no evidence that any drugs were planted." The first comment (to the extent it subtly implied that the jury should judge Suggs for his failure to "say" anything) strikes us as an isolated remark, not a flagrant one. *Cf. United States v. Sills*, 662 F.3d 415, 417–18 (6th Cir. 2011). And the jury instruction about Suggs's right not to testify would have cured any conceivable prejudice. *Cf. United States v. Murphy*, 518 F. App'x 396, 401 (6th Cir. 2013). The second remark was a fair "comment on the evidence." *United States v. Jennings*, 40 F. App'x 1, 4 (6th Cir. 2001) (order). It was "made in response to" the defense theory that Pride planted the methamphetamine. *United States v. Forrest*, 402 F.3d 678, 686 (6th Cir. 2005). "[T]he prosecutor was entitled to point out the lack of evidence supporting" the theory. *Id.*

Suggs next argues that the prosecutors wrongly opined on his decision to stand trial. One prosecutor noted that, just as Suggs tried to flee from the police, "so too the defense during this

trial has tried to flee from the inescapable evidence of the defendant's guilt." Another prosecutor told the jurors that Suggs was arguing for "jury nullification" by suggesting that the jurors should acquit based on a dislike of Pride, even if they would otherwise conclude that Suggs was guilty. These comments fell within the prosecutors' "wide latitude" during closing argument. *Boyd*, 640 F.3d at 669 (citation omitted). The fleeing remark was designed to reiterate that little evidence supported the defense theory that Pride planted the methamphetamine. The nullification remark was designed to respond to defense counsel's efforts to criticize the government's reliance on Pride. *Cf. Gonzalez*, 512 F.3d at 293. Defense counsel suggested, among other things, that it was a "good thing" that the police were "not on trial" because "they'd be convicted of aggravated and negligent use of a lying drug-addict snitch."

Suggs lastly suggests that the prosecutors improperly impugned defense counsel by arguing that counsel's "job is to distract you from the evidence that shows their client's guilt." This comment, too, fell within the "wide latitude" given to prosecutors. *Boyd*, 640 F.3d at 669 (citation omitted). Indeed, we have held that "[a] prosecutor commenting that the defense is attempting to trick the jury is a permissible means of arguing so long as those comments are not overly excessive or do not impair the search for truth." *United States v. August*, 984 F.2d 705, 715 (6th Cir. 1992) (per curiam); *see United States v. Richardson*, 352 F. App'x 47, 50 (6th Cir. 2009). The statement in this case was far more innocuous. In context, the prosecutor was simply arguing that the defense lacked evidentiary support for the theory that Pride planted the methamphetamine and that the jury should not engage in the speculation that this defense required.

### E. Reasonableness of Suggs's Sentence

Suggs ends by claiming that his 151-month sentence (one at the bottom of his guidelines range) is procedurally unreasonable both because the district court failed to consider the disparity

between his sentence and Pride's and because the court failed to account for his mental illness. We review his claim for an abuse of discretion. *United States v. Parrish*, 915 F.3d 1043, 1047 (6th Cir. 2019). To impose a procedurally reasonable sentence, a district court must, among other things, consider the sentencing factors in 18 U.S.C. § 3553(a). *See id.* Suggs's two challenges fail because the district court adequately did so.

*First*, Suggs correctly notes that a sentencing court must consider "the need to avoid unwarranted sentence disparities" among similarly situated defendants. 18 U.S.C. § 3553(a)(6). But he incorrectly suggests that this factor required the court to consider the disparities between his significant sentence and Pride's modest one. It did not. Section 3553(a)(6) "'concerns *national* disparities,' and does not require district courts to consider 'disparities between codefendants.'" *United States v. Arellanes-Pena*, 729 F. App'x 430, 434 (6th Cir. 2018) (quoting *United States v. Conatser*, 514 F.3d 508, 521 (6th Cir. 2008)). Pride was not even a *federal* codefendant. He was a defendant in a *state* case. But "§ 3553(a)(6)'s admonition that sentencing courts avoid unwarranted disparities is directed only at federal court to federal court disparities[.]" *United States v. Malone*, 503 F.3d 481, 486 (6th Cir. 2007). And the district court did recognize the need to avoid unwarranted disparities, which explains why it imposed a *within*-guidelines sentence. In contrast, "[t]he very thing [Suggs] presumably wants—a *below*-guidelines sentence—is more likely to create disparities than eliminate them." *United States v. Swafford*, 639 F.3d 265, 270 (6th Cir. 2011) (emphasis added).

*Second*, Suggs correctly recognizes that § 3553(a)(1) requires a court to consider the "history and characteristics of the defendant," including a defendant's mental illness. *See United States v. Robinson*, 778 F.3d 515, 523 (6th Cir. 2015); *see also United States v. Jones*, 795 F. App'x 444, 445 (6th Cir. 2020). But the district court did so: "As far as the history and characteristics of the

defendant, without question, Mr. Suggs was raised in a very difficult environment . . . .  And his mental health challenges from early on has certainly been a part of that story."  That is precisely why the district court imposed a sentence at the bottom of the guidelines range.

We affirm.